# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2019AP1376-OA |

| | |
|---|---|
| COMPLETE TITLE: | Nancy Bartlett, Richard Bowers, Jr. and Ted Keneklis,<br>　　　　Petitioners,<br>　　v.<br>Tony Evers, in his official capacity as Governor of the State of Wisconsin, Joel Brennan, in his official capacity as Secretary of the Wisconsin Department of Administration, Wisconsin Department of Administration, Craig Thompson, in his official capacity as Secretary of the Wisconsin Department of Transportation, Wisconsin Department of Transportation, Peter Barca, in his official capacity as Secretary of the Wisconsin Department of Revenue, and Wisconsin Department of Revenue,<br>　　　　Respondents. |

ORIGINAL ACTION

| | |
|---|---|
| OPINION FILED: | July 10, 2020 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | April 20, 2020 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| 　COURT: | |
| 　COUNTY: | |
| 　JUDGE: | |

JUSTICES:

ROGGENSACK, C.J., filed an opinion concurring in part and dissenting in part. ANN WALSH BRADLEY, J., filed an opinion concurring in part and dissenting in part, in which DALLET, J., joined. KELLY, J., filed an opinion concurring in part and dissenting in part, in which REBECCA GRASSL BRADLEY, J. joined. HAGEGDORN, J., filed a concurring opinion, in which ZIEGLER, J., joined.

NOT PARTICIPATING:

ATTORNEYS:

For the petitioners, there were briefs filed by *Richard M. Esenberg, Anthony LoCoco, Lucas T. Vebber, Luke N. Berg,* and *Wisconsin Institute for Law & Liberty*, Milwaukee. There was an oral argument by *Richard M. Esenberg*.

For the respondents, there were briefs filed by *Colin T. Roth* and *Maura FJ Whelan*, assistant attorneys general; with whom on the brief was *Joshua L. Kaul*, attorney general. There was an oral argument by *Colin T. Roth*.

An amicus curiae brief was filed on behalf of The Legislature by *Misha Tseytlin, Kevin M. LeRoy,* and *Troutman Sanders LLP*, Chicago, Illinois. There was an oral argument by *Misha Tseytlin*.

**2020 WI 68**

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No.    2019AP1376-OA

STATE OF WISCONSIN            :      IN SUPREME COURT

Nancy Bartlett, Richard Bowers, Jr. and
Ted Keneklis,

                Petitioners,

        v.

Tony Evers, in his official capacity as
Governor of the State of Wisconsin,
Joel Brennan, in his official capacity as
Secretary of the Wisconsin Department of
Administration, Wisconsin Department of
Administration, Craig Thompson, in his official
capacity as Secretary of the Wisconsin
Department of Transportation, Wisconsin
Department of Transportation, Peter Barca, in
his official capacity as Secretary of the
Wisconsin Department of Revenue, and Wisconsin
Department of Revenue,

                Respondents.

**FILED**

**JUL 10, 2020**

Sheila T. Reiff
Clerk of Supreme Court

¶1    PER CURIAM.    We review the petitioners' original action requesting a declaration that Governor Evers exceeded his constitutional authority to partially veto appropriation bills. The petitioners assert that four series of partial vetoes in 2019 Wis. Act 9——the state's 2019-21 biennial budget bill——are unconstitutional.

¶2   The parties refer to the provisions based on their content before the vetoes:   (1) the school bus modernization fund; (2) the local roads improvement fund; (3) the vapor products tax and (4) the vehicle fee schedule.

¶3   The petitioners contend that the four series of vetoes are unconstitutional. Article V, Section 10(1)(b) of the Wisconsin Constitution provides that the governor may approve appropriation bills "in whole or in part."

¶4   No rationale has the support of a majority.  However, a majority has reached a conclusion with respect to the constitutionality of each series of vetoes.  Five justices conclude that the vetoes to the school bus modernization fund are unconstitutional.  The same five also conclude that the vetoes to the local roads improvement fund are unconstitutional.[1]  Four justices conclude that the vetoes to the vapor products tax are unconstitutional.[2]  Five justices conclude that the vetoes to the vehicle fee schedule are constitutional.[3]

¶5   Chief Justice Roggensack concludes that the vetoes to the school bus modernization fund and the local roads improvement

---

[1] Chief Justice Roggensack and Justices Ziegler, Rebecca Grassl Bradley, Kelly and Hagedorn conclude that these series of vetoes are unconstitutional.

[2] Justices Ziegler, Rebecca Grassl Bradley, Kelly and Hagedorn conclude that the vetoes to the vapor products tax are unconstitutional.

[3] Chief Justice Roggensack and Justices Ann Walsh Bradley, Ziegler, Dallet and Hagedorn conclude that the vetoes to the vehicle fee schedule are constitutional.

fund are unconstitutional because they "resulted in topics and subject matters that were not found in the enrolled bill." Chief Justice Roggensack's concurrence/dissent, ¶99. She also concludes that the vetoes to the vapor products tax and vehicle fee schedule are constitutional because they did not alter "the topic or subject matter of the part approved." Id., ¶106.

¶6 Justice Ann Walsh Bradley and Justice Dallet conclude that the four series of vetoes are constitutional because they "result[ed] in objectively complete, entire, and workable laws." Justice Ann Walsh Bradley's concurrence/dissent, ¶170. Consequently, they would not grant relief.

¶7 Justice Kelly and Justice Rebecca Grassl Bradley conclude that the four series of vetoes are unconstitutional. Justice Kelly's concurrence/dissent, ¶230. They conclude that the vetoes violate the Wisconsin Constitution's origination clause, amendment clause and legislative passage clause. Id., ¶¶223, 225-26, 228.

¶8 Justice Hagedorn and Justice Ziegler conclude that the vetoes to the school bus modernization fund, the local roads improvement fund and the vapor products tax are unconstitutional. Justice Hagedorn's concurrence, ¶¶269-75. They also conclude that the vetoes to the vehicle fee schedule are constitutional because they merely negated a policy proposal advanced by the legislature. Id., ¶268.

¶9 Accordingly, rights are declared such that the vetoes to the school bus modernization fund, the local roads improvement fund and the vapor products tax are unconstitutional and invalid.

3

Relief is granted such that the portions of the enrolled bills that were vetoed are in full force and effect as drafted by the legislature.  See State ex rel. Sundby v. Adamany, 71 Wis. 2d 118, 125, 237 N.W.2d 910 (1976).  The vetoes to the vehicle fee schedule are constitutional, and no relief is granted with respect to these vetoes.

*By the Court.*-Rights declared; relief granted in part and denied in part.

¶10 PATIENCE DRAKE ROGGENSACK, C.J.  *(concurring in part, dissenting in part).*  This is an original action brought by three taxpayers, Nancy Bartlett, Richard Bowers, Jr. and Ted Keneklis (Taxpayers) against Governor Tony Evers and other government officials and agencies.  Taxpayers challenge the validity of several vetoes Governor Evers made to the 2019–21 biennial budget.[1]  Specifically, they challenge a series of vetoes that changed a school bus modernization fund into an alternative fuel fund.  They also challenge another series that removed conditions from a local road improvement fund, effectively changing it into a fund for "local grants" or "local supplements."  Third, they challenge a series of vetoes that altered a vehicle fee schedule by changing the amount truck owners must pay to register their vehicles.  Lastly, they challenge one veto that altered a section that imposed a tax on "vapor products" by expanding the definition of vapor product to include liquid heated by a vaping device.  Taxpayers assert that these vetoes went beyond the governor's partial veto power, which is provided in Article V, Section 10(1)(b) of the Wisconsin Constitution:  "Appropriation bills may be approved in whole or in part by the governor, and the part approved shall become law."

¶11  I conclude that the part approved by the governor, i.e., the consequences of the partial veto, must not alter the topic or

---

[1] "The Wisconsin budget process covers two fiscal years at a time——a biennium."  Benjamin W. Proctor, Comment, <u>Wisconsin's Chief Legislator:  The Governor's Partial Veto Authority and the New Tipping Point</u>, 90 Marq. L. Rev. 739, 739 n.3 (2007).

1

subject matter of the "whole" bill before the veto.[2] Stated otherwise, such a veto does not alter the stated legislative idea that initiated the enrolled bill. Therefore, Governor Evers could not use his partial veto power to change the school bus modernization fund into an alternative fuel fund. Nor could he use his partial veto to change the local road improvement fund into a fund for local grants or local supplements, devoid of any requirements that it be used for local roads. I partially concur with the per curiam opinion that these two series of vetoes are invalid and have no effect on the law enacted by the legislature. I further partially concur that he lawfully used his partial veto power to alter the amount truck owners must pay to register their vehicles. However, I partially dissent from the per curiam opinion because he also lawfully used his partial veto to alter the definition of vapor product. This veto should stand.

## I. BACKGROUND

¶12 On June 25 and 26, 2019, the Wisconsin State Assembly and Senate, respectively, passed the 2019-21 biennial budget bill. The enrolled bill was presented to Governor Evers, who signed it with several vetoes on July 3, 2019.[3] On July 31, 2019, Taxpayers filed an original action, which was amended on August 19, 2019. We took jurisdiction. The legislature filed an amicus brief, generally supporting Taxpayers.

---

[2] "Once identical versions of a bill pass both the state assembly and the state senate, the bill is referred to as an 'enrolled bill' and is ready for the governor's consideration." Id. at 741 n.19.

[3] 2019 Wis. Act 9.

2

A. The School Bus Modernization Fund

¶13 The first series of vetoes changed a school bus modernization fund into an alternative fuel fund. For context, the State of Wisconsin is a beneficiary of a trust created by a consent decree following litigation against Volkswagen. The terms of the trust establish various permissible uses:

> [T]he state could utilize funding from the trust to scrap, and then repower or replace certain eligible vehicles and equipment, including: (a) Class 8 local freight trucks and port drayage trucks; (b) Class 4 through 8 school buses, shuttle buses, or transit buses; (c) freight switchers; (d) ferries and tugs; (e) ocean going vessels shore power; (f) Class 4 through 7 local freight trucks; (g) airport ground support equipment; (h) forklifts and port cargo handling equipment; and (i) light duty zero emission vehicle supply equipment (electric or hydrogen vehicle charging stations).[4]

During the 2017-19 biennium, Wisconsin used the settlement funds "for replacing eligible state vehicles and for awarding grants to transit systems to replace eligible public transit vehicles."[5]

¶14 For 2019-21, Governor Evers proposed a budget that would have expanded uses of the settlement funds to include "the installation of charging stations for vehicles with an electric

---

[4] Executive Session Record for Paper #505 from the Record of Committee Proceedings on 2019 Assembly Bill 56 (Paper #505) at 3 (June 6, 2019), https://docs.legis.wisconsin.gov/misc/lfb/budget/2019_21_biennial_budget/102_budget_papers/505_volkswagen_settlement_volkswagen_settlement.pdf.

[5] Joint Committee on Finance Motion #129 (Motion #129) (June 6, 2019), https://docs.legis.wisconsin.gov/misc/lfb/jfcmotions/2019/2019_06_06/008_volkswagen_settlement/002_motion_129_volkswagen_settlement.pdf.

3

motor."[6] The Legislature's Joint Committee on Finance rejected Governor Evers' proposal, instead opting to create a school bus modernization fund to aid school boards in purchasing "energy efficient" school buses.[7]

¶15 Governor Evers utilized his partial veto power to attempt to accomplish his initial proposal. To do so, he partially vetoed § 55c and vetoed the entirety of § 9101(2i).

¶16 The markup of § 55c reads:

> 16.047(4s) of the statutes is created to read: 16.047 (4s) ~~SCHOOL BUS REPLACEMENT~~ GRANTS. ~~(a) In this subsection: 1. "School board" has the meaning given in s. 115.001(7).2. "School bus" has the meaning given in s. 121.51(4).(b)~~ The department [of administration] shall establish a program to award grants of settlement funds from the appropriation under s. 20.855(4)(h) ~~to school boards~~ for ~~the replacement of school buses owned and operated by the school boards with school buses that are energy efficient, including school buses that use~~ alternative fuels. ~~Any school board may apply for a grant under the program. (c) As a condition of receiving a grant under this subsection, the school board shall provide matching funds equal to the amount of the grant award. (d) A school board may use settlement funds awarded under this subsection only for the payment of costs incurred by the school board to replace school buses in accordance with the settlement guidelines.~~

As partially vetoed, the section states: "The department shall establish a program to award grants of settlement funds from the appropriation under s. 20.855(4)(h) for alternative fuels."

---

[6] 2019 Assembly Bill 56, §§ 52, 53 & 54; see also Paper #505, at 2 (explaining the governor wanted to "[e]xpand DOA's authority to use settlement monies to award grants for the replacement of public transit vehicles to also include awarding grants for the installation of charging stations for electric vehicles").

[7] Joint Stipulation of Facts and Joint Statement that There Are No Material Disputed Facts (Joint Statement), ¶¶21-22.

¶17 Governor Evers vetoed the entirety of § 9101(2i):

(2i) ~~VOLKSWAGEN SETTLEMENT FUNDS. Of the settlement~~ ~~funds in s. 20.855(4)(h), during the 2019-21 fiscal~~ ~~biennium, the department of administration shall~~ ~~allocate $3,000,000 for grants under s. 16.047 (4s) for~~ ~~the replacement of school buses.~~

B. The Local Road Improvement Fund

¶18 The second series of vetoes removed conditions from a local road improvement fund, effectively changing it into a fund for "local grants" or "local supplements," which did not require expenditures for local roads. For context: "[the Department of Transportation] DOT administers the Local Roads Improvement Program (LRIP) to assist political subdivisions in improving seriously deteriorating local roads by reimbursing political subdivisions for certain improvements. LRIP includes an entitlement component and a discretionary component."[8]

¶19 Governor Evers partially vetoed §§ 126 and 184s and vetoed the entirety of § 1095m. Section 126, schedule item Wis. Stat. § 20.395(2)(fc), of the enrolled bill appropriated $90,000,000 for local road improvement as a discretionary supplement.[9] The markup reads: "(fc) Local ~~roads improvement~~ ~~discretionary~~ supplement . . . ~~90,000,000~~ [and Governor Evers wrote in 75,000,000]." As partially vetoed, the scheduled item states: "Local supplement . . . 75,000,000."

---

[8] Legislative Reference Bureau Analysis of 2019 Assembly Bill 56 (Analysis of Bill 56), at 90, https://docs.legis.wisconsin.gov/2019/related/proposals/ab56.pdf.

[9] Joint Statement, ¶24.

¶20 Governor Evers also partially vetoed § 184s: "20.395(2)(fc) of the statutes is created to read: 20.395(2) (fc) Local ~~roads improvement discretionary~~ supplement. From the general fund, as a continuing appropriation, the amounts in the schedule for ~~the~~ local ~~roads improvement discretionary supplemental~~ grant ~~program under s. 86.31 (3s).~~" As partially vetoed, the section states: "Local supplement. From the general fund, as a continuing appropriation, the amounts in the schedule for local grant [sic]."

¶21 Governor Evers vetoed the entirety of § 1095m:

~~86.31 (3s) of the statutes is created to read: 86.31 (3s) DISCRETIONARY SUPPLEMENTAL GRANTS. (a) Funds provided under s. 20.395 (2) (fc) shall be distributed under this subsection as discretionary grants to reimburse political subdivisions for improvements. The department shall solicit and provide discretionary grants under this subsection until all funds appropriated under s. 20.395 (2) (fc) have been expended. (b) 1. From the appropriation under s. 20.395 (2) (fc), the department shall allocate $32,003,200 in fiscal year 2019-20, to fund county trunk highway improvements. 2. From the appropriation under s. 20.395(2) (fc), the department shall allocate $35,149,400 in fiscal year 2019-20, to fund town road improvements. 3. From the appropriation under s. 20.395 (2) (fc), the department shall allocate $22,847,000 in fiscal year 2019-20, to fund municipal street improvement projects. (c) Notwithstanding sub. (4), a political subdivision may apply to the department under this subsection for reimbursement of not more than 90 percent of eligible costs of an improvement.~~

C. The Vehicle Fee Schedule

¶22 A third series of vetoes altered the amount truck owners must pay to register their vehicles. Registration fees had varied depending on the weight class of the vehicle. Section 1988b of the enrolled bill would have made the fee for four weight classes

6

the same. In so doing, it would have increased the fee for two weight classes and decreased the fee for two others. Governor Evers used his partial veto powers to retain the legislature's proposed fee increases and void its proposed decreases. In the marked-up language, italicized words represent deletions by the legislature, underlined words represent insertions by the legislature and crossed-out words represent partial vetoes by Governor Evers:

> 341.25(2)(a) to (cm) of the statutes are amended to read: 341.25 (2)(a) Not more than 4,500 $ *75.00* 100.00 (b) Not more than 6,000 . . . . . . . . . . . *84.00* 100.00 (c) Not more than 8,000 . . . . . . . . . . *106.00* 100.00 (cm) Not more than 10,000 . . . . . . . . . . *155.00* 100.00

¶23 The parties stipulated to a table that summarizes the changes:[10]

---

[10] *Id.*, ¶33.

| Maximum Gross Weight in Pounds | Pre-Act 9 Annual Fee | Annual Fee Approved by the Legislature | Annual Fee Chosen by Governor Evers |
|---|---|---|---|
| Not more than 4,500 | $75.00 | $100.00 | $100.00 |
| Not more than 6,000 | $84.00 | $100.00 | $100.00 |
| Not more than 8,000 | $106.00 | $100.00 | $106.00 |
| Not more than 10,000 | $155.00 | $100.00 | $155.00 |

### D. The Vapor Products Tax

¶24 The last challenged veto altered a section that imposed a tax on "vapor products" by expanding the definition of vapor product to include liquid heated by a vaping device. For context, sometimes vaping fluid is sold separately from vaping devices. An analogy is pipe tobacco, which is sold separately from pipes. Section 1754 of the enrolled bill defined vapor products to include the hardware that produces vapor from the application of a heating element to liquid. However, the definition did not encompass the liquid. Governor Evers partially vetoed a clause in the definition, which expanded it to include the liquid:

> 139.75 (14) of the statutes is created to read: 139.75 (14) "Vapor product" means a noncombustible product that produces vapor or aerosol for inhalation from the application of a heating element ~~to a liquid or other substance that is depleted as the product is used~~, regardless of whether the liquid or other substance contains nicotine.

### II. DISCUSSION

### A. Standard of Review

¶25 As this is an original action, we have no lower court opinion to review.[11] We are required to interpret Article V,

_____

[11] Original jurisdiction is proper under Wis. Const. art. VII,

8

Section 10(1)(b) to decide the pending controversy, which presents a question of law. Koschkee v. Taylor, 2019 WI 76, ¶9, 387 Wis. 2d 552, 929 N.W.2d 600.

¶26 Taxpayers ask us to overturn our precedent in part. They bear the burden of persuading us to do so. State v. Breitzman, 2017 WI 100, ¶5 n.4, 378 Wis. 2d 431, 904 N.W.2d 93.

### B. Overview of the Partial Veto Power

¶27 Taxpayers argue that some of our decisions have deviated from the original meaning of Article V, Section 10(1)(b) and that we should return to the original meaning. They assert, "[a]s originally enacted, Article V, Section 10(1)(b) of the Wisconsin Constitution authorized the governor to approve or disapprove legislative proposals capable of separate enactment but appearing in a single bill, nothing more." Therefore, I thoroughly analyze the constitutional text and our precedent. In addition, I consider failed and successful amendments to the governor's partial veto power to demonstrate that the people of Wisconsin have actively responded to our decisions when they have deemed it proper to do so.

### 1. Amendment of Article V, Section 10

¶28 The Wisconsin Constitution, as originally adopted in 1848, did not allow the governor to veto less than an entire bill. At that time, no state constitution authorized the veto of less than an entire bill. Such authority first appeared in the constitution of the Confederate States in 1861 and was limited to

---

§ 3(2). We have invoked our original jurisdiction to interpret the scope of the governor's partial veto powers on eight prior occasions, which are discussed below.

appropriations bills. Henry Campbell Black, Relation of the Executive Power to Legislation 103 (1919). By 1919, thirty-seven states allowed their governor to veto less than an entire appropriations bill. Id. Notably, these states generally adopted "item" vetoes. For example, the Illinois Constitution authorized the governor to disapprove "any one or more items or sections" of an appropriations bill. State ex rel. Wis. Tel. Co. v. Henry, 218 Wis. 302, 311, 260 N.W. 486 (1935) (quoting Ill. Const. art. V, § 16 (1935)). One contemporary source defined an "item" as "any part of a bill [making appropriations] which is sufficiently distinct that it may be separated without serious damage to the essential force of the residue." John Mabry Mathews, American State Government 223 (1926).

¶29 In 1911, Wisconsinites began debating whether to authorize the governor to veto less than an entire appropriations bill because the legislature started "packaging multiple appropriation measures into larger, omnibus bills." Richard A. Champagne, Staci Duros & Madeline Kasper, The Wisconsin Governor's Partial Veto, Reading the Constitution, June 2019, at 1, 3-4. This became known as "logrolling":

> [T]he practice of jumbling together in one act inconsistent subjects in order to force a passage by uniting minorities with different interests when the particular provisions could not pass on their separate merits, with riders of objectionable legislation attached to general appropriation bills in order to force the governor to veto the entire bill and thus stop the wheels of government or approve the obnoxious act.

State ex rel. Martin v. Zimmerman, 233 Wis. 442, 447-48, 289 N.W. 662 (1940).

¶30 Before 1911, the legislative practice was to pass on each appropriation in a separate bill. Champagne et al., The Wisconsin Governor's Partial Veto, at 3. By 1913, Governor Francis E. McGovern began to publically complain about the changes to the appropriations process. Id.; State ex rel. Wis. Senate v. Thompson, 144 Wis. 2d 429, 438, 424 N.W.2d 385 (1988). He argued that the legislature was passing "omnibus bills" with "fifty to one hundred items." Champagne et al., The Wisconsin Governor's Partial Veto, at 3 (quoting Associated Press, McGovern Criticizes State Legislature, Janesville Daily Gazette, Sept. 18, 1913, at 1). Furthermore, the legislature would wait until the current budget was close to expiring. Champagne et al., The Wisconsin Governor's Partial Veto, at 3. He said this practice "tied the hands of the executive, and he practically had no alternative except to approve the appropriations as a whole." Id. (quoting McGovern Criticizes State Legislature, at 1). Ultimately, Governor McGovern lost his campaign for increased veto powers. Champagne et al., The Wisconsin Governor's Partial Veto, at 4.

¶31 The next substantial push for increased gubernatorial power came in 1925. That year, two proposals were considered. The first never made it out of committee. Id. at 5 & n.32. The second proposal failed by a vote of 14 to 9 in the Senate. Id. at 6. It read, in part: "The governor may disapprove or reduce items or parts of items in any bill appropriating money. So much of such bill as he approves shall upon his signing become law." 1925 Senate Joint Resolution 23.

11

¶32 In 1927, Senator William Titus introduced a similar resolution: "Appropriation bills may be approved in whole or in part by the governor, and the part approved shall become law, and the part objected to shall be returned in the same manner as provided for other bills." Champagne et al., The Wisconsin Governor's Partial Veto, at 6 (quoting 1927 Senate Joint Resolution 35; 1927 Enrolled Joint Resolution 37). The resolution passed both houses. One newspaper explained, "This would allow that executive to return unfavored appropriations to the legislators, at the same time passing others in the same bill thus speeding the legislative work." Champagne et al., The Wisconsin Governor's Partial Veto, at 7 n.38 (quoting Beats Plan for Repeal of Car Tax, Capital Times, March 15, 1927). The resolution again passed both houses in 1929, and it was ratified by the people in November 1930.[12] Champagne et al., The Wisconsin Governor's Partial Veto, at 7.

¶33 Both the failed 1925 resolution and the successful 1930 amendment are believed to have been drafted by Edwin Witte, the Chief of the Legislative Reference Library (the predecessor to the Legislative Reference Bureau), and drafting files describe an item veto. See Frederick B. Wade, The Origin & Evolution of the Partial Veto Power, Wis. Lawyer, Mar. 2008, at 12, 14; Mary E. Burke, Comment, The Wisconsin Partial Veto: Past, Present and Future, 1989 Wis. L. Rev. 1395, 1402 n.44. The drafting file for the 1927 resolution indicates that Senator Titus requested the Legislative

---

[12] The Wisconsin Constitution provides that a proposed amendment must be approved by two consecutive legislatures and then ratified by the people. Wis. Const. art. XII, § 1.

Reference Library to draft a resolution "to allow the Governor to veto items in appropriation bills." A cover sheet in the drafting file reads, "res. to permit Gov. to veto items in app. bills." The library wrote to Senator Titus, "Enclosed herewith is a revised draft of the Joint Resolution you asked us to prepare, to allow the Governor to veto items in appropriation bills." See John S. Weitzer, Comment, The Wisconsin Partial Veto: Where Are We and How Did We Get Here? The Definition of "Part" and the Test of Severability, 76 Marq. L. Rev. 625, 631 n.35 (1993) (summarizing the drafting file). The 1929 drafting file has a similar reference to "allow[ing] the governor to veto items." Wade, The Origin & Evolution of Partial Veto Power, at 14.

¶34 The drafting files do not indicate why, if the drafter intended an item veto, he used the word, part. Champagne et al., The Wisconsin Governor's Partial Veto, at 6. Notably though, some contemporary sources used the term "partial" veto to describe an item veto. Black, Relation of the Executive Power to Legislation, at 101 (chapter titled "The Selective or Partial Veto" describing an item veto used in many states).

¶35 The campaign for ratification of the 1930 amendment also described an item veto. Champagne et al., The Wisconsin Governor's Partial Veto, at 5. For example, Witte——the believed drafter—— wrote a brief supporting its ratification. Edwin E. Witte, Brief in Support of the Proposed Amendment to the Constitution to Allow the Governor to Veto Items in Appropriation Bills (1930). Its first sentence reads: "The governor's veto of items in appropriation bills is an essential part of an executive budget

13

system." Id. As one article, published in the Wisconsin Lawyer in 2008, summarizes: "The brief uses the words item and items a total of 19 times. . . . Under these circumstances, it appears that Witte viewed the terms part and item as interchangeable synonyms for expressing the item veto concept." Wade, The Origin & Evolution of the Partial Veto Power, at 14.

¶36 Several newspaper articles at the time of the constitutional amendment described an item veto. For example, The League of Women Voters' "explanation of the proposal" said it would "enable the governor to veto single items in an appropriations bill without vetoing the entire bill." A Proposed Amendment, Wausau Daily Record-Herald, Oct. 28, 1930, at 8. A Capital Times article quoted Senator Thomas Duncan, who introduced the 1929 resolution, as saying, "[t]he item veto is absolutely indispensable." It would "merely giv[e] back to the governor the power" he had when "most appropriations were divided into separate bills." Duncan Tells Need for New Vote Powers, Capital Times, Oct. 14, 1930, at 7. Similarly, the Wisconsin State Journal reported him saying the new veto power was "not revolutionary, but on the contrary [was] in successful operation in 37 states." Veto Rule Better Law Step, Claim, Wis. St. J., Oct. 13, 1930, at 7.

¶37 Following the amendment's ratification, sources also described it as an item veto. For example, the 1931–32 Wisconsin Blue Book explained the amendment permitted the governor "to veto single items in appropriation bills." The Wisconsin Blue Book 583 n.1 (1931).

2. Our Precedent

14

¶38 We first interpreted the governor's partial veto power in Henry.[13] Since then, we have interpreted the governor's partial veto powers seven more times. As our decisions demonstrate, governors have become more creative and aggressive with their partial vetoes. Yet, our decisions explain only two relevant limits:[14] (1) the part approved must be a complete, entire and workable law; and (2) the part approved must be germane to the topic or subject matter of the enrolled bill before the veto. Constitutional amendments also have added: "In approving an appropriation bill in part, the governor may not create a new word by rejecting individual letters in the words of the enrolled bill, and may not create a new sentence by combining parts of 2 or more sentences of the enrolled bill." Wis. Const. art. V, § 10(1)(c).

a. Early Cases

¶39 In the midst of the Great Depression, Wisconsinites were suffering. The legislature passed an emergency relief package. Henry, 218 Wis. at 307-08. As one comment summarizes, "To raise revenue for the relief efforts, the nine-section bill included six sections providing authority to impose emergency income taxes. Another section of the bill appropriated funds for relief efforts

---

[13] At passage, the provisions now in Article V, Section 10(1)(b) were not in a subsection, but were italicized and inserted into Section 10. The wording was a bit different: "Appropriation bills may be approved in whole or in part by the governor, and the part approved shall become law, and the part objected to shall be returned in the same manner as provided for other bills." Wis. Const. art. V, § 10 (1930).

[14] For write-in vetoes, where a governor crosses out a number and writes in a lesser number, we have articulated additional restrictions, which are described below.

15

and specified how the funds were to be distributed. Two other sections stated legislative intent." Burke, The Wisconsin Partial Veto, at 1401. The governor "when presented with the bill, vetoed the legislative intent sections and the distribution subsections of the appropriation section." Id. The assembly did not override his vetoes.

¶40 The Wisconsin Telephone Co., a taxpayer, commenced an original action, arguing:

> [T]he governor's disapproval of parts of the bill, as originally passed, by the legislature, and his approval of the remaining parts thereof, was unauthorized under [Wis. Const. art. V, § 10] because the constitutional grant of power to the governor by that section to approve parts of an appropriation bill and to disapprove parts thereof does not grant power to him to approve the appropriation, and disapprove a proviso or condition inseparably connected to the appropriation, nor to disapprove parts of an appropriation bill that are not an appropriation.

Henry, 218 Wis. at 309.

¶41 We did not decide whether the governor had the power to reject provisos or conditions that are inseparably connected. Id. Instead, we concluded that "the parts which were disapproved by the governor were not provisos or conditions which were inseparably connected to the appropriation." Id. But we acknowledged that there was a plausible argument that the governor could not veto inseparable provisos or conditions. Id. at 309–10 (citing State ex rel. Teachers & Officers v. Holder, 23 So. 643 (Miss. 1898)).

¶42 We also concluded that the governor could "pass independently on every separable piece of legislation in an appropriation bill." Henry, 218 Wis. at 315. In our interpretation of the term, "part," which was employed in the

16

amendment of Article V, Section 10, we reasoned that the partial veto power must be broader than an item veto. Id. at 310-14. We also concluded that "part" should be given its "usual, customary, and accepted meaning [as] . . . '[o]ne of the portions, equal or unequal, into which anything is divided, or regarded as divided; something less than a whole.'" Id. at 313 (quoting Part, Webster's New Int'l Dictionary 1781 (2d ed.)). We observed that the part approved constituted a "complete, entire, and workable law, for the appropriation for relief purposes, of the money to be raised, as tax revenues thereunder, and for the allotment and use of that appropriation." Henry, 218 Wis. at 314. The vetoes were upheld.

¶43  In State ex rel. Finnegan v. Dammann, 220 Wis. 143, 264 N.W. 622 (1936), we were asked to decide whether a bill on which the governor asserted a partial veto was an appropriation bill. We concluded that the enrolled bill was not an appropriations bill. Id. at 148-49. Therefore, the governor's attempted veto was "ineffective because the subject matter of the bill did not fall within the constitutional provision authorizing a partial veto." Id. at 149. "Finnegan added nothing to Henry's analysis of the definition of 'part' and the test of severability." Weitzer, The Wisconsin Partial Veto, at 637.

¶44  Four years after Finnegan, we decided Martin. As one comment summarizes, "the legislature enacted a bill changing the amount of state funds appropriated as aid for dependent children." Burke, The Wisconsin Partial Veto, at 1405. As with Henry, the governor vetoed sections and subsections of the enrolled bill. The Secretary of State refused to publish the act on procedural

17

grounds, which are unimportant for our purposes, as well as substantive grounds. As a substantive matter, he argued that the partial vetoes "so changed the legislative program or policy . . . as to render the parts approved . . . invalid." Martin, 233 Wis. at 450.

¶45 We began by construing Article V, Section 10. We concluded that the partial veto amendment was not ambiguous, and as "amended in 1930 it must be construed as a whole." Id. at 447. We explained that the amendment's "purpose was to prevent, if possible, the adoption of omnibus appropriation bills, logrolling, the practice of jumbling together in one act inconsistent subjects in order to force a passage by uniting minorities with different interests when the particular provisions could not pass on their separate merits." Id. at 447-48. We then rejected the Secretary of State's argument, relying on Henry:

> It must be conceded that the governor's partial disapproval did effectuate a change in policy; so did the partial veto of the bill involved in the case of [Henry], supra, which this court held to be valid. The question here is whether the approved parts, taken as a whole, provide a complete workable law. We have concluded that they do, and we must give them effect as such.

Id. at 450.

¶46 For the next four decades, "the partial veto was rarely used." Champagne et al., The Wisconsin Governor's Partial Veto, at 1. "Aside from the 1931 and 1933 biennial budget bills, in which there were 12 partial vetoes, subsequent governors either did not partially veto any provisions or partially vetoed only one

18

or two provisions in budget bills until the 1969 legislative session." Id.

### b. Later Cases

¶47 We next addressed the partial veto in State ex rel. Sundby v. Adamany, 71 Wis. 2d 118, 237 N.W.2d 910 (1976). As one comment explains, "[i]n Sundby, Governor [Patrick] Lucey vetoed clauses of sentences. Previously, partial vetoes involved only sections and subsections of appropriation bills." Weitzer, The Wisconsin Partial Veto, at 639 n.89. "The subject matter of the portion of the appropriations bill to which these partial vetoes appl[ied] involved tax levy limits imposed on towns, villages, cities and counties." Sundby, 71 Wis. 2d at 121. The markup read:

> If the [governing body of the political subdivision] desires to increase its tax levy above the limitations specified in this section, it shall publish such intent in a class I notice under ch. 985 in the official town newspaper. The notice shall include a statement of the purpose and the amount of the proposed levy and the amount by which it wishes to exceed the limits imposed by this section. ~~If, within 20 days after publication of the notice, a petition is filed with the town clerk signed by a number of electors equal to, or in excess of, 5% of the number of electors casting ballots in the town in the last gubernatorial election,~~ the question of the proposed amount of increase in levy above the limitations specified in this section shall be submitted to a referendum at a spring election, general election or special election.

Id. at 122-23. "In substance, the governor's veto made mandatory the local referendums which the bill, as passed by the legislature, made optional." Id. at 124.

¶48 We explained that the constitutions of other states focused on item vetoes and limited partial vetoes to "item or items." Id. at 128. However:

19

The Wisconsin Constitution, by way of contrast, confers upon its chief executive the power to object to "part" of the bill and, in construing this power, this court has indicated that the chief executive has a greater range of options pursuant to such terminology as to the manner in which he may exercise the partial veto than he might have if the power were limited to "items."

Id.

¶49 We addressed two arguments not thoroughly analyzed in our prior decisions for curtailing the governor's partial veto power. First, we considered how separation of powers analysis should impact our understanding of the amendment of Article V, Section 10. In particular, we considered that "[t]he legislative power is vested by the Wisconsin Constitution in the senate and the assembly." Id. at 131. But we then explained that the governor plays a role in the legislative process. Id. at 131-34. Second, we addressed whether the partial veto power could "bring about an affirmative change in the result intended by the legislature" or merely "negative what the legislature has done." Id. at 134. We rejected the distinction between affirmative and negative changes. Id. We stated:

Every veto has both a negative and affirmative ring about it. There is always a change of policy involved. We think the constitutional requisites of [Wis. Const.] art. V, [§] 10, fully anticipate that the governor's action may alter the policy as written in the bill sent to the governor by the legislature.

Id. We upheld the vetoes, noting as we had in Henry that the provisions were "separable." Id. at 135.

¶50 Two years after Sundby, we decided State ex rel. Kleczka v. Conta, 82 Wis. 2d 679, 264 N.W.2d 539 (1978). The governor's markup read: "(1) Every individual filing an income tax statement

20

may designate ~~that their income tax liability be increased by~~ $1 for deposit into the Wisconsin Election Campaign Fund for the use of eligible candidates under s. 11.50." Id. at 685. The consequence of this veto was that taxpayers could choose to provide $1 to the campaign fund without increasing their tax liability. Id.

¶51 The petitioners and the legislature's amicus made two arguments. First, the petitioners argued that the partial veto "created an appropriation where none existed before." Id. at 704. Second, the petitioners and the amicus argued that "voluntary contributions were a proviso or condition upon which the appropriation depended and that such proviso or condition were ipso facto inseverable from the appropriation itself." Id.

¶52 We rejected the first argument because it was "incorrect, under the facts, for the petitioners to assert that the bill as altered by the Governor created an appropriation where none existed before. . . . Rather, it affected the source from which the appropriated funds were to be derived." Id. at 704-05.

¶53 Next, we acknowledged that "[s]everability is indeed the test of the Governor's constitutional authority to partially veto a bill." Id. at 705. We explained that the test for severability is whether the part approved constitutes a complete, entire and workable law. Id. at 705-06. In Henry, we had suggested that some provisos or conditions might be inseparable; in Kleczka, we said that discussion in Henry was simply dicta. Kleczka, 82 Wis. 2d at 712-14. Henry did not need to speculate about the constitutionality of vetoing provisos or conditions because the

21

relevant sections and subsections were not provisos or conditions. In Kleczka, we, therefore, upheld the veto.

¶54 Justice Hansen authored the first separate writing in this line of cases, concurring in part and dissenting in part. He noted that "[i]n recent years, partial vetoes have not only increased greatly in number; they have been applied to ever smaller portions of bills." Id. at 719 (Hansen, J., concurring in part and dissenting in part). This concerned him, and he stated, "the standard adopted by the court poses no discernible obstacle to the use of deletions to produce a complete, entire and workable bill concerning a subject utterly unrelated to that of the bill as passed by the legislature." Id. at 723. His separation of powers analysis came to the opposite conclusion of the majority: "At some point this creative negative constitutes the enacting of legislation by one person, and at precisely that point the governor invades the exclusive power of the legislature to make laws." Id. at 720.

¶55 He stated: "the partial veto power should be exercised only as to the individual components, capable of separate enactment, which have been joined together by the legislature in an appropriation bill. That is, the portions stricken must be able to stand as a complete and workable bill." Id. at 726. Stated otherwise, Justice Hansen would have applied the complete, entire and workable law requirement to both the part approved and the part rejected.

¶56 A few years after Kleczka, in 1983, Governor Anthony Earl was the first to veto individual letters, which has since

22

become known as the "Vanna White"[15] or "pick-a-letter" veto. Benjamin W. Proctor, Comment, <u>Wisconsin's Chief Legislator: The Governor's Partial Veto Authority and the New Tipping Point</u>, 90 Marq. L. Rev. 739, 750 (2007). In a law review article he later authored, he stated:

> In the 1983-85 budget bill, I vetoed letters and digits to reduce a paragraph of five sentences into a one-sentence paragraph of twenty-two words. This time, the legislature was not interested in the political result; it looked only at the philosophical question of the balance of power between the legislative and executive branches. It determined decisively that as a representative of the executive branch, I had gone too far. The veto was overridden unanimously by the state assembly and with only one dissenting vote in the senate.

Anthony S. Earl, <u>Personal Reflections on the Partial Veto</u>, 77 Marq. L. Rev. 437, 440 (1994).

¶57 Just a few years later, Governor Tommy Thompson utilized the Vanna White veto. He struck "phrases, digits, letters, and word fragments in an executive budget bill, so as to create new words, sentences, and dollar amounts." Champagne et al., <u>The Wisconsin Governor's Partial Veto</u>, at 12.

¶58 Governor Thompson's vetoes were not overridden, and the constitutionality of some of them came before us in <u>Wis. Senate</u>, 144 Wis. 2d 429. In total, thirty-seven vetoes were challenged. To give one example:

> [O]ne section of the budget bill would have created a statutory provision allowing courts to detain for "not more than 48 hours" any juvenile violating a delinquency proceeding court order. Governor Thompson vetoed the

---

[15] Vanna White is a television personality on Wheel of Fortune. James K. Conant, <u>Wisconsin Politics and Government: America's Laboratory of Democracy</u> 46 (2006).

23

term "48 hours" and creatively substituted "ten days" by vetoing individual letters and words from another sentence in that section.

Burke, The Wisconsin Partial Veto, at 1396. To give another example, he reduced a $750,000 appropriation to $75,000 by vetoing a "0." Id.

¶59 Reiterating our analysis from Kleczka——that the part approved must be a complete, entire and workable law——we upheld the partial vetoes. Wis. Senate, 144 Wis. 2d at 449-50.

¶60 We also explained that the consequences of any partial veto must be a law that remains consistent with the topic or subject matter of the "whole" bill. Id. at 437. "This limit[ed] the ability of a governor to strike just any word in a sentence." Champagne et al., The Wisconsin Governor's Partial Veto, at 19; see also Gordon B. Baldwin, The Partial Veto Power Threatens Democracy: A Rebuttal, 5 Graven Images 267, 268 (2002).

¶61 There have been two cases regarding the partial veto power since Wis. Senate: Citizens Utility Bd. v. Klauser, 194 Wis. 2d 484, 534 N.W.2d 608 (1995) and Risser v. Klauser, 207 Wis. 2d 176, 558 N.W.2d 108 (1997). In Citizens Utility Board, we concluded that the governor was permitted "to strike a numerical sum appropriated in the bill and to insert a different, smaller number as the appropriated sum." Citizens Utility Bd., 194 Wis. 2d at 488. In Risser, we concluded that the governor's "write-in veto may be exercised only on a monetary figure which is an appropriation amount." Risser, Wis. 2d at 181.

¶62 Notably, in both of these opinions, we reiterated the limitation we had described as a "germaneness" limitation. Id. at 183; Citizens Utility Bd., 194 Wis. 2d at 506. In Citizens Utility

24

Board, we explained the write-in veto "survives the 'topicality' or 'germaneness' requirement set forth in Wis. Senate. The new provision approved by the governor——'$250,000'——relates to the same subject matter as the original legislative enactment, viz., a money appropriation to be utilized by [Citizens Utility Board] as a public interest advocacy entity." Citizens Utility Bd., 194 Wis. 2d at 505. In Risser, while we mentioned a germaneness limitation, we did not apply it. However, we did state that "a governor's power to craft legislation necessarily must have constitutional limits." Risser, 207 Wis. 2d at 197.

### 3. Failed and Successful Amendments

¶63 The executive and legislative branches are acutely aware of our decisions in this area. There have been numerous proposals to amend the partial veto power. Champagne et al., The Wisconsin Governor's Partial Veto, at Appendix Tbl. 3 (listing proposals from 1935 to 2013). Indeed, the same year as Henry, "state legislators proposed limiting the governor's partial veto authority to 'appropriation items.' The proposal, however, failed to pass either the Assembly or the Senate." Burke, This Wisconsin Partial Veto, at 1403. A similar series of events followed Martin and Kleczka. Id. at 1406 n.77; Proctor, Wisconsin's Chief Legislator, at 763 n.156.

¶64 Twice, the partial veto power has been successfully curtailed by amendment, once in 1990 and once in 2008. Together, these amendments are set out at Article V, Section 10(1)(c): "In approving an appropriation bill in part, the governor may not create a new word by rejecting individual letters in the words of

25

the enrolled bill, and may not create a new sentence by combining parts of 2 or more sentences of the enrolled bill." The 1990 amendment, which prohibited the creation of words by deleting letters, was a response to Wis. Senate. Burke, The Wisconsin Partial Veto, at 1426. The 2008 amendment was a response to partial vetoes made by Governor Jim Doyle and prohibited the creation of new sentences by combining parts of two or more sentences of the enrolled bill. Proctor, Wisconsin's Chief Legislator, at 752-54.

### C. Stare Decisis

¶65 In the case-at-hand, Taxpayers ask us to overturn Henry because it adopted, in their view, an overly broad definition of "part." Alternatively, they ask us to overrule Kleczka and "hold that the governor may not exercise the partial veto in a way that transforms the meaning and purpose of a law into something entirely new." In particular, they ask us to reconsider Kleczka's rejection of the suggestion in Henry that the governor cannot veto "provisos or conditions which were inseparably connected to the appropriation." The Legislature's amicus asks us to adopt the test proposed by Justice Hansen's separate writing in Kleczka: that both the part approved and the part rejected must be complete, entire and workable laws.

¶66 "We are respectful of the doctrine of stare decisis." State v. Roberson, 2019 WI 102, ¶49, 389 Wis. 2d 190, 935 N.W.2d 813. As we have explained:

> [Adhering to precedent] ensures that existing law will not be abandoned lightly. When existing law is open to revision in every case, deciding cases becomes a mere exercise of judicial will, with arbitrary and

26

unpredictable results. Consequently, this court has held that any departure from the doctrine of stare decisis demands special justification.

Id., ¶49 (quoting Schultz v. Natwick, 2002 WI 125, ¶37, 257 Wis. 2d 19, 653 N.W.2d 266) (modifications in the original).

¶67 Because Taxpayers' argument is grounded in originalism, I note that even prominent originalists respect stare decisis. As Justice Scalia once stated: "You have to make stare decisis an exception to any philosophy of judicial interpretation." Law and Justice Scalia, Hoover Institution at 23:30-38 (Mar. 16, 2009), https://www.youtube.com/watch?v=zE9biZT_z1k&t=1435s (last visited June 27, 2020); see also Antonin Scalia, A Matter of Interpretation: Federal Courts and the Law 140 (1997) ("[S]tare decisis is not a part of my originalist philosophy; it is a pragmatic exception to it."). In one of Justice Scalia's best known writings, he explained:

> In [originalism's] undiluted form, at least, it is medicine that seems too strong to swallow. Thus, almost every originalist would adulterate it with the doctrine of stare decisis——so that Marbury v. Madison would stand even if [a prominent legal scholar] should demonstrate unassailably that it got the meaning of the Constitution wrong.

Antonin Scalia, Originalism: The Lesser Evil, 57 U. Cinn. L. Rev. 849, 861 (1989).

¶68 When we are asked to overturn precedent, we consider whether:

> (1) Changes or developments in the law have undermined the rationale behind a decision; (2) there is a need to make a decision correspond to newly ascertained facts; (3) there is a showing that the precedent has become detrimental to coherence and consistency in the law; (4) the prior decision is "unsound in principle;" or (5) the prior decision is "unworkable in practice."

27

Roberson, 389 Wis. 2d 190, ¶50 (citing <u>Bartholomew v. Wis. Patients Comp. Fund & Compcare Health Servs. Ins. Corp.</u>, 2006 WI 91, ¶33, 293 Wis. 2d 38, 717 N.W.2d 216). "We also may consider 'whether [our past decision] has produced a settled body of law.'" <u>Roberson</u>, 389 Wis. 2d 190, ¶50 (quoting <u>Johnson Controls, Inc. v. Employers Ins. of Wausau</u>, 2003 WI 108, ¶99, 264 Wis. 2d 60, 665 N.W.2d 257) (modifications in original).

¶69 To begin with the request to overturn <u>Henry</u>, Taxpayers argue:

> [S]tare decisis is "at its weakest when [this Court] interpret[s] the Constitution because [its] interpretations[s] can be altered only by constitutional amendment." <u>Franchise Tax Bd. of California v. Hyatt</u>, 139 S. Ct. 1485, 1499 (2019) (quoting <u>Agostini v. Felton</u>, 521 U.S. 203, 235 (1997)). Appropriately, then, this Court has recognized it need not "retain constitutional interpretations that were objectively wrong when made." <u>Koschkee</u>, 387 Wis. 2d 552, ¶8 n.5. And, as already explained, <u>Henry</u>'s interpretation was "objectively wrong when made."

By "objectively wrong," Taxpayers mean that <u>Henry</u> is not in accord with the original meaning of the 1930 constitutional amendment. In addition to the history of Article V, Section 10(1)(b), Taxpayers refer us to other provisions of the Wisconsin Constitution that they assert support their argument. For example, they cite Article VIII, Section 8, which provides:

> On the passage in either house of the legislature of any law which . . . makes, continues or renews an appropriation of public or trust money . . . three-fifths of all the members elected to such house shall in all such cases be required to constitute a quorum therein.

Taxpayers further argue that <u>Henry</u> has not created a "reliance interest." They also contend that <u>Henry</u> has proven "unworkable in

28

practice" because it has led to, arguably, abusive practices by increasingly creative governors.

¶70 Governor Evers responds with several points. First, he argues that Taxpayers' reliance on Koschkee is misplaced. Koschkee "overruled a single decision from three years earlier that had 'no common legal rationale' for its mandate." He argues that Henry is different because of "[t]he near century of consistent partial-veto decisions" stemming from it. In essence, Governor Evers argues that Henry has produced a settled body of law, and he claims a reliance interest. Second, Governor Evers cites the constitutional amendments in 1990 and 2008. They are, according to him, a "part of the corpus of settled law that must be uprooted if [Taxpayers] win" because "both amendments presuppose that Article V, § 10(1)(b)[] empowers the Governor to veto any 'part' of an appropriation bill, no matter how small." Third, Governor Evers contends that partial veto decisions have been workable in practice. He claims we have had "no problem drawing a line between valid and invalid vetoes."

¶71 I reject Taxpayers' request to overturn Henry. First, I cannot say that Henry was objectively wrong. An objectively wrong opinion is not merely an opinion that was "mistaken." Cf. State v. Friedlander, 2019 WI 22, ¶18, 385 Wis. 2d 633, 923 N.W.2d 849 (explaining the difference between an opinion that is objectively wrong and an opinion that is mistaken in the context of statutory interpretation); State v. Fuerte, 2017 WI 104, ¶61, 378 Wis. 2d 504, 904 N.W.2d 773 (same) (Abrahamson, J., dissenting). An objectively wrong opinion is one whose

29

interpretation of the law is not plausible. State v. Lagundoye, 2004 WI 4, ¶¶72-75, 268 Wis. 2d 77, 674 N.W.2d 526 (Abrahamson, C.J., dissenting). That cannot be said about Henry's interpretation of Article V, Section 10(1)(b).

¶72 As we explained in Henry, the words "item" and "part" are not synonyms. Henry, 218 Wis. at 310-11. Furthermore, nearly every state constitution that authorized an "item veto" at the time of the 1930 amendment used the word "item." Id. at 310-12. Indeed, the failed 1925 resolution, likely drafted by the same person that drafted the 1930 amendment, used the word "item." Therefore, if the intent of the 1930 amendment was to create an "item veto," it easily could have been done. In addition, Henry was decided in 1935——a mere five years after the amendment. Therefore, as the earliest case interpreting the amendment, to some extent, Henry is itself evidence of the original meaning of the 1930 amendment.

¶73 More fundamentally, the successful, subsequent amendments to Article V, set out in § 10(1)(c), prohibit a governor from "creat[ing] a new word by rejecting letters in the words of the enrolled bill" and from "creat[ing] a new sentence by combining parts of 2 or more sentences of the enrolled bill." Article V, § 10(1)(c). If we were to read § 10(1)(b) as permitting the veto of only an item, then there would have been no need for § 10(1)(c), which prohibits the governor from removing letters to create a new word or creating new sentences with words from two or more sentences. Stated otherwise, § 10(1)(c) would have no effect after an "item" is vetoed, as nothing of the "item" would have been left.

30

However, § 10(1)(c) has effect because by vetoing "part," smaller portions of an enrolled bill can be altered, as shown by Wis. Senate, on which § 10(1)(c) placed limits.

¶74 Taxpayers' references to other constitutional provisions are not persuasive; indeed, the references highlight why Taxpayers have not established that Henry is objectively wrong. Taxpayers ask us to minimize the role Article V, § 10(1)(c) plays in our interpretation, even though it sets out successful amendments, which clearly relate to Article V, § 10(1)(b). Yet, they ask us to consider other provisions that are not clearly related. For example, Taxpayers have not explained how Article VIII, Section 8 supports their argument. It provides quorum requirements for votes on fiscal bills. What that has to do with the partial veto power, which takes place after such a vote, is unclear.

¶75 Second, our decisions, consisting of eight cases dating back eighty-five years, have produced a "settled body of law" despite naysayers' attempts to unsettle it. Roberson, 389 Wis. 2d 190, ¶50 (quoting Johnson Controls, 264 Wis. 2d 60, ¶99). Indeed, we have previously rejected a similar argument about original meaning. Wis. Senate, 144 Wis. 2d at 461 n.18. We cannot rehash original meaning——and its interaction with stare decisis——every time a partial veto comes before us. There is good reason that prominent originalists have recognized stare decisis as an exception to their judicial philosophy. Scalia, Originalism: The Lesser Evil, at 861. Furthermore, the political branches, as well as the media and legal scholars, are aware of our interpretations of Article V, Section 10(1)(b), and Wisconsinites actively have

31

debated the proper scope of the governor's partial veto power. As already explained, there have been numerous attempts to amend the partial veto power, two of which were successful.

¶76 At bottom, item veto advocates, despite substantial effort, have not been able to convince their fellow citizens to adopt an item veto. At this point, as we said in <u>Henry</u>:

> If the legislature and people wish the governor to have only the power to veto items in an appropriation bill, a constitutional amendment may be desirable. It should, however, be understood that this court has no power to toy with the constitutional grant of a partial veto to the governor and to replace it with a veto power that may be more sensible and palatable. Any claimed excesses on the part of the governor in the exercise of this broad partial veto authority are correctable not by this court, but by the people, either at the ballot box or by constitutional amendment.

<u>Wis. Senate</u>, 144 Wis. 2d at 465.

¶77 Third, Taxpayers are incorrect in suggesting that <u>Henry</u> has proved unworkable in practice because governors have exercised creative partial vetoes which we have evaluated. An opinion may be unworkable in practice when courts have difficulty applying it. <u>See</u> <u>State v. Harris</u>, 2010 WI 79, ¶43, 326 Wis. 2d 685, 786 N.W.2d 409. We have not had difficulty interpreting challenged vetoes in light of our past decisions; therefore, <u>Henry</u> has not proved unworkable in practice.

¶78 Taxpayers alternatively argue we should overturn <u>Kleczka</u> because it is "detrimental to coherence and consistency in the law." They assert it is inconsistent with our decisions interpreting separation of powers. They cite <u>League of Women Voters of Wis. v. Evers</u>, 2019 WI 75, 387 Wis. 2d 511, 929, N.W.2d 209, <u>Tetra Tech EC, Inc. v. DOR</u>, 2018 WI 75, 382 Wis. 2d 496, 914

32

N.W.2d 21 (lead) and <u>Gabler v. Crime Victims Rights Bd.</u>, 2017 WI 67, 376 Wis. 2d 147, 897 N.W.2d 384. They also cite Federalist No. 58 as authority for a particular model of separation of powers.

¶79 The Legislature in its amicus brief adds:

> When precedent does "not even discuss" a critical aspect of the relevant text, <u>stare decisis</u> does not require the [c]ourt to persist in a prior, deficient interpretation. <u>State v. Denny</u>, 2017 WI 17, ¶¶67-70, 373 Wis. 2d 390, 891 N.W.2d 144. In the context of Article V, Section 10, this [c]ourt has correctly interpreted one portion of the text, reading "part approved becomes law" to mean "a complete, entire, and workable law." <u>Wis[.] Senate</u>, 144 Wis. 2d at 437. Yet, this [c]ourt has not given attention to another portion of the text, which explains when the "rejected part" "become[s] law." This has created a serious separation-of-powers problem, wherein the Governor can effectively enact law by vetoing sentence fragments.

Legislature Amicus Br. at 3. To explain, the Legislature makes a temporal argument about when the part rejected becomes law. The part approved becomes law when it is signed by the governor; the part rejected does not. The part rejected is returned to the legislature and becomes law if and only if it is "approved by two-thirds of the members present." Wis. Const. art. V, § 10(2)(b). Therefore, the part rejected, according to the Legislature's amicus, must be capable of separate enactment at a later date, independent of the part approved.

¶80 Governor Evers responds that no inconsistency has been created. The cases cited by Taxpayers dealt with issues bearing no resemblance to the governor's partial veto power. In <u>League of Women Voters</u>, we concluded that "[h]ow the Legislature meets, when it meets, and what descriptive titles the Legislature assigns to those meetings or their operating procedures constitute parts of

33

the legislative process with which the judicial branch 'has no jurisdiction or right' to interfere." League of Women Voters, 387 Wis. 2d 511, ¶37 (internal quotations removed). In Tetra Tech, we concluded that we do not give great weight deference to administrative agencies' conclusions of law. Tetra Tech, 382 Wis. 2d 496, ¶108. In Gabler, we concluded that an executive agency could not, "acting pursuant to authority delegated by the legislature, review a Wisconsin court's exercise of discretion, declare its application of the law to be in error, and then sanction the judge for making a decision the agency disfavors[.]" Gabler, 376 Wis. 2d 147, ¶36.

¶81 Governor Evers responds that the Legislature's amicus is inconsistent with historical practice:

> The phrase "shall become law" simply describes the transformation that occurs when a bill is presented to the Governor for his approval.
>
> . . . .
>
> The Legislature would instead read "shall become law" as imposing a complete-and-workable-law test wherever the phrase appears. But that makes no sense applied to the rejected part of an appropriation bill. Unlike the part approved——which immediately becomes law under Article V, § 10(1)(b)——the rejected part never needs to function as a stand-alone law. Either it remains rejected and never becomes law, or, upon a successful legislative override, it rejoins the part approved and "the bill as originally passed by the legislature becomes law." Richard A. Champagne & Madeline Kasper, Wis. Legis. Reference Bureau, The Veto Override Process in Wisconsin 1 (2019).

¶82 I reject Taxpayers' request to overturn Kleczka. Their argument presumes that states are obligated to follow a particular

model of separation of powers that delegates the "power of the purse" totally to the legislature.

¶83 However, our jurisprudence consistently describes the governor's role in the budgeting process as "quasi-legislative." Wis. Senate, 144 Wis. 2d at 454 (quoting Henry, 218 Wis. 2d at 314). In Wis. Senate, we stated:

> [The 1930 amendment] gave the governor a constitutionally recognized role in the legislative budgetary function. The legislature itself has recognized the governor's legislative role in the budget area by ceding to the governor the initial responsibility for preparing the biennial budget report and requiring him to submit his executive budget bill together with suggestions for the best methods for raising the needed revenues. It was no coincidence that the same 1929 legislature which passed [ch. 97, Laws of 1929], adopting the executive budget system for this state, thereby creating a statutory role for the governor in the budgetary process, also passed——for the requisite second time——the [] joint resolution proposing the constitutional amendment to [Wis. Const.] art. V, [§] 10 to provide for the governor's partial veto authority. These acts were all part of the complete overhaul of the budget system in this state that took place at that time. The partial veto power the governor may exercise over appropriation bills is simply one tool he has for controlling his own executive budget bill.

Wis. Senate, 144 Wis. 2d at 454–55 (internal citations omitted). Taxpayers simply ignore these statements because they do not fit their understanding of separation of powers.

¶84 Furthermore, our jurisprudence is not unique in describing a quasi-legislative role for the governor. A veto power, regardless of its contours, is inherently legislative. The United States Supreme Court has said so in a number of cases. For example, it has explained:

35

It is said that the approval by the President of a bill passed by Congress is not strictly an executive function, but is legislative in its nature; in this view, it is argued, conclusively shows that his approval can legally occur only on a day when both Houses are actually sitting in the performance of legislative functions. Undoubtedly the President when approving bills passed by Congress may be said to participate in the enactment of laws which the Constitution requires him to execute. But that consideration does not determine the question before us. As the Constitution, while authorizing the President to perform certain functions of a limited number that are legislative in their general nature, does not restrict the exercise of those functions to the particular days on which the two Houses of Congress are actually sitting in the transaction of public business, the court cannot impose such a restriction upon the Executive.

La Abra Silver Min. Co. v. United States, 175 U.S. 423, 453 (1899); see also Edwards v. United States, 286 U.S. 482, 490 (1932) ("The President acts legislatively under the Constitution, but he is not a constituent part of the Congress."); cf. Rateree v. Rockett, 852 F.2d 946, 951 (7th Cir. 1988) ("[W]hen the Vice President of the United States votes in the Senate to break a tie, U.S. Const. art. I § III cl. 4, he acts legislatively, not executively. Similarly, the President acts legislatively when he approves or vetoes bills passed by Congress.").

¶85 Taxpayers seem to assume that the governor cannot have a quasi-legislative role because creating law is a core power of the legislature. Under this theory, the power to create legislation cannot be shared. At least two problems exist with this assumption.

¶86 First, as demonstrated by rulemaking, and as we have long concluded, the legislature may delegate its power to make law to the executive. Martinez v. DILHR, 165 Wis. 2d 687, 697, 478

36

N.W.2d 582 (1992) (citing Schmidt v. Local Affairs & Dev. Dep't, 39 Wis. 2d 46, 56, 158 N.W.2d 306 (1968)) ("Legislative power may be delegated to an administrative agency as long as adequate standards for conducting the allocated power are in place."). Such a delegation would be impossible if the executive were not permitted to have at least a quasi-legislative role in our constitutional structure.

¶87 Second, this theory does not account for the text of the Wisconsin Constitution. As Kelczka said, we must look first to the text of the Wisconsin Constitution, not references to philosophical works, such as Montesquieu's The Spirit of Law. Kleczka, 82 Wis. 2d at 710 n.3 (explaining how Montesquieu and the Federalist Papers should impact our understanding of the partial veto power). Taxpayers would have us reverse this by first considering philosophical works and then consider the constitutional text. Such an analysis would ignore that Wisconsinites are free to assign powers traditional to one branch of government to another branch by constitutional amendment.[16] I also cannot ignore how the constitutional text has been understood for nearly a century.

¶88 In addition, whether the Federalist Papers support Taxpayers' position is unclear. As we explained in Kleczka, the

---

[16] As Judge Posner explained when the partial veto power was challenged in federal court: "That it is unusual, even quirky, does not make it unconstitutional. It violates no federal constitutional provision because the [United States] Constitution does not fix the balance of power between branches of state government." Risser v. Thompson, 930 F.2d 549, 554 (7th Cir. 1991).

Federalist Papers can be read to support an expansive reading of the partial veto power. "The authors of The Federalist . . . repeatedly alluded to the tendency, in republican forms of government, to the aggrandizement of the legislative branch at the expense of the other branches." Id. (citing Federalist No. 73 (Hamilton); No. 49 (Madison); No. 48 (Madison)). Indeed, the legislature's practice of logrolling spawned the need for Article V, Section 10(1)(b).

¶89 Moreover, I cannot accept the position of Legislature's amicus that we should apply the complete, entire and workable law test to the part rejected. The textual analysis provided by Governor Evers fits historical practice: the phrase "shall become law" describes the transformation that occurs when proposed legislation takes on legally binding force. It does not indicate that the part rejected must be a complete, entire and workable law. Governors and legislatures have long understood that the part rejected rejoins the part approved if the legislature overrides the governor's veto. Governor Evers cites a document by the Legislative Reference Bureau that says as much. Champagne & Kasper, The Veto Override Process in Wisconsin. Also, our decisions are consistent with this understanding. Citizens Utility Bd., 194 Wis. 2d at 488. If the governor were to veto "$100,000" and write in "$90,000," all would understand that a legislative override of the veto would mean that $10,000 is added to the $90,000 to return the appropriation to its original number. See id.

D. Application

38

¶90 Having broken no new ground, I employ our decisions and continue the constitutional analysis of "part" in the four vetoes that were challenged. Taxpayers do not dispute that the "part approved" constitutes a complete, entire and workable law. Rather, the dispute before us is whether Governor Evers' partial vetoes went too far by altering the topic or subject matter of the enrolled bills. Stated otherwise, we have a dispute over whether the parts approved alter the stated legislative idea for which the enrolled bill was passed.

### 1. Topic or Subject Matter

¶91 The legislature controls whether an idea will result in an enrolled bill that will be presented to the governor for signature. A veto that does not alter legislative control of the topic or subject matter of enrolled bills has been referred to as "germane." Wis. Senate, 144 Wis. 2d at 437. Stated otherwise, such a veto does not alter the stated legislative idea that initiated the enrolled bill. The text of Article V, § 10(1)(b), which employs the term, "part," twice in the same sentence and connects "part" to the "whole" bill states: "bills may be approved in whole or in part by the governor, and the part approved shall become law." A plain reading of the constitutional text connects the "part" approved by the governor to the "whole" bill because it is only a "part" of that "whole" bill that is vetoed. When the part approved by the governor does not alter the topic or subject matter of the whole bill presented to him for signature, the part approved maintains the legislature's choice of topic or subject matter that underlies the "whole" bill. Stated otherwise, when

39

legislative topic or subject matter is maintained, the "part" approved and the "part" that was not approved remain portions of the same "whole" bill, consistent with the constitutional text of § 10(1)(b). Clearly, the evaluation of "part" and "whole" in § 10(1)(b) depends on how broadly the topic or subject matter is defined.

¶92 For example, we have previously concluded that $250,000 is a "part" of $350,000, and, therefore, the governor may veto $350,000 and write in $250,000. Citizens Utility Bd., 194 Wis. 2d at 505-06. We explained that "$250,000 is 'part' of $350,000[] because $250,000 is 'something less than' $350,000, and $250,000 goes 'to make up, with others . . . a larger number,' i.e., $350,000." Id. (quoting Part, Webster's New Int'l Dictionary 1781 (2d ed.)).

¶93 We also rejected an argument that "part" means only "physical part[s] of the bill." Citizens Utility Bd., 194 Wis. 2d at 503-04. To explain, "[i]f the governor strikes a $100 appropriation and writes in $80, the amount the governor attempts to veto is $20. However, '$20' does not appear anywhere in the bill. '$20' is not physically part of the bill. It is part of the bill only conceptually." Id. at 503. Nevertheless, we have permitted write-in vetoes because, conceptually, the amount remaining after the veto is a part of the bill. Id. at 510. Stated otherwise, the idea contemplated by the legislature in funding an identified entity or described project remains after the veto. If the entity or project is funded to a lesser degree because of a write-in veto, the legislative idea that initiated

40

the enrolled bill remains after the veto nevertheless. Similarly, an enrolled bill's topic or subject matter is part of its makeup.

¶94 When the topic or subject matter of a bill is altered through veto from that of the whole bill that was presented for the governor's signature to a topic or subject matter conceived by the governor, the veto is outside of the governor's constitutional authority. When the veto is used in that manner, the "part approved" cannot be defined as a "part" of the "whole" bill passed by the legislature because it is inconsistent with the constitutional meaning of "part" in Article V, Section 10(1)(b).

¶95 Secondary sources have discussed the topic and subject matter limitation on vetoes. I note that their understanding, which is referred to as germaneness, is consistent with my analysis in this case. In particular, Jack Stark in discussing vetoes made by Governor Doyle that triggered the 2008 constitutional amendment, stated:

> The case law has recently produced a significant restriction, holding that the material left after a veto must be germane to (have the same subject matter as) the material from which it was fashioned. If the vetoes of the most recent budget bill that got the most attention had been challenged, they would most likely have been reviewed in light of that principle. With two related vetoes the Governor effected a transfer of several hundred million dollars from the transportation fund to the general fund. The money transferred would ultimately increase school aid. In both of those vetoes, the germaneness requirement appears to have been violated. Most of the material that was vetoed was about particular transportation projects, and some of it was about the unfunded liability of the state's retirement system.

Jack Stark, Symposium, <u>Is the Wisconsin Constitution Obsolete? A Conference on the Wisconsin Constitution</u>, 90 Marq. L. Rev. 411,

41

417-18 (2007); see also Champagne et al., The Wisconsin Governor's Partial Veto, at 18-19.

2. Application of Topic or Subject Matter Limitation

a. School Bus Modernization and Local Road Improvement Funds

¶96 Taxpayers argue:

Sections 55c and 9101(2i) of Act 9 allocated $3 million of certain settlement funds for modernizing school buses, with specific conditions as to how that program should operate. Governor Evers transformed this into an open-ended grant "for alternative fuels" with no conditions, and then directed by fiat that the agency in charge spend up to $10 million "for electric vehicle charging stations." This is so far removed from what the Legislature intended to create that there is no question that the portions Evers' vetoed were non-severable.

¶97 As for the local road improvement fund, they state:

Sections 126, 184s, and 1095m of Act 9 allocated $90 million for the improvement of local roads, along with specific sub-allocations for county trunk highways, town roads, and municipal streets. Governor Evers used the partial veto to transform this into a $75 million allocation "for local grant [sic]." This veto entirely eliminated the core purpose of the award (local road improvements), instead creating a generic slush fund with no meaningful constraints.

¶98 Governor Evers has made no response to these points. Quoting from the dissent in Wis. Senate, he seems to acknowledge in a footnote of his brief that "what remains [must] be germane." Wis. Senate, 144 Wis. 2d at 474 (Bablitch, J., dissenting). But he does not explain how what he labels as "parts that remain" are in accord with their originating actions of the enrolled bill. Instead, he argues that he can veto "any part, no matter how small" unless prohibited by Article V, Section 10(1)(c).

42

¶99  I agree with Taxpayers; these vetoes resulted in topics and subject matters that were not found in the enrolled bill, i.e., they were not a "part" of the enrolled bill.  Stated otherwise, the enrolled bill says nothing about an "alternative fuel fund." The parts of the enrolled bill that remain after this veto have nothing to do with school buses; indeed, the remaining part has nothing to do with schools or even education.  Governor Evers has publically stated he wants to use the fund for electric charging stations, a use not contemplated by any part of the enrolled bill and one specifically rejected by the legislature.

¶100 Notably, Governor Evers vetoed the entirety of § 9101(2i), which "allocate[d] $3,000,000 for grants under s. 16.047 (4s) for the payment of school buses." (Emphasis added.) Section 9101(2i) further demonstrates that the legislative idea of § 16.047(4s) was to replace school buses.  The legislative idea of § 16.047(4s) was not, for example, limiting carbon emissions.

¶101 Legislative history confirms that the legislative idea was to replace school buses.  Settlement funds in the previous biennium were used to replace "eligible state vehicles" and "public transit vehicles."[17]  Governor Evers sought to "[e]xpand DOA's authority to use settlement monies to award grants for replacement of public transit vehicles to also include grants for the installation of charging stations for electric vehicles."[18] Governor Evers' proposed expansion was rejected in favor of one more analogous to previous uses of the settlement funds.

_____

[17] Motion #129.

[18] Paper #505.

43

¶102 Similarly, the partial vetoes of the local road improvement fund, which created a generic fund, are precisely the kinds of vetoes commentators have assumed would violate the topic or subject matter limitation. Stark, Is the Wisconsin Constitution Obsolete, at 418 ("With two related vetoes the Governor effected a transfer of several hundred million dollars from the transportation fund to the general fund. The money transferred would ultimately increase school aid. In both of those vetoes, the germaneness requirement appears to have been violated.").

¶103 The legislative idea was to fund an ongoing road improvement program.[19] Section 1095m, vetoed in its entirety by Governor Evers, made this clear. It allocated specific amounts to fund "county truck highway improvements," "town road improvements" and "municipal street improvements." A general undirected fund was not part of a fund created to improve local roads because a general fund can be spent on virtually any subject, i.e., topics and subject matters never considered by the legislature. Indeed, a general fund could be used to accomplish goals explicitly rejected by the legislature during its deliberative process.

¶104 I cannot uphold these vetoes. Accordingly, I partially concur with the per curiam opinion that these vetoes have no effect on the provisions in the enrolled bills that the legislature enacted.

---

[19] Analysis of Bill 56, at 90.

44

b. Vehicle Fee Schedule and Vapor Products Tax

¶105 Taxpayers have not carried their burden with respect to the remaining vetoes. With regard to the vehicle registration fees, Taxpayers argue:

> Governor Evers accepted the increases and rejected the decreases, creating a new fee schedule that is neither graduated nor equalized. The question, under traditional severability analysis, is whether the Legislature would have intended the fee increases on lighter trucks without the corresponding decreases for heavier trucks. Given that the obvious purpose of the statutory change was to equalize the fee schedule, the answer is no.

This is an inherently different argument than what Taxpayers raised in regard to the school bus modernization fund and the local road improvement fund. The part approved is clearly related to the subject matter of vehicle registration fees. These vetoes are consistent with those that we approved in Wis. Senate and that long have been considered within the governor's partial veto power. Burke, The Wisconsin Partial Veto, at 1396.

¶106 A similar analysis applies to the veto that altered the definition of vapor product. The veto expanded the definition of vapor product, thereby expanding what could be taxed. But it did not alter the topic or subject matter of the part approved. Rather, it would seem all products that would have been taxed under the enrolled bill will continue to be taxed. Furthermore, the liquid used in vaping devices is within the scope of the phrase vapor product as used in common parlance. Had the legislature left vapor product undefined, reasonable people may have assumed it encompassed liquid sold separately.

E. Remedy

45

¶107 The Legislature's amicus has asked us to consider a remedy that is purely prospective. As it explains, while our decisions "'[n]ormally' apply 'retrospectively,' purely prospective application——which does not apply a new decision even to the case at hand——is appropriate where retrospective application of a 'new principle of law' would 'unsettl[e]' reliance interests." See State v. Beaver Dam Area Dev. Corp., 2008 WI 90, ¶¶95-101, 312 Wis. 2d 84, 752 N.W.2d 295. Had I accepted the Legislature's argument and concluded that the part rejected by the governor should be a complete, workable law, I might view its request differently. However, I reject this request because I break no new ground with this decision. Indeed, the topic and subject matter limitation, sometimes referred to as germaneness, has been discussed in three prior cases. It is not a new principle of law. Risser, 207 Wis. 2d at 183; Citizens Utility Bd., 194 Wis. 2d at 506; Wis. Senate, 144 Wis. 2d at 451-52.

### III. CONCLUSION

¶108 I conclude that the part approved by the governor, i.e., the consequences of the partial veto, must not alter the topic or subject matter of the "whole" bill before the veto. Stated otherwise, such a veto does not alter the legislative idea that initiated the enrolled bill. Therefore, Governor Evers could not use his partial veto power to alter the school bus modernization fund into an alternative fuel fund. Nor could he use it to alter the local road improvement fund into a fund for local grants or local supplements, devoid of any requirement that it be used for local roads. These two series of vetoes are invalid and have no

46

effect on those laws. However, Governor Evers lawfully used his partial veto power to alter the amount truck owners must pay to register their vehicles. He also lawfully exercised his partial veto power in regard to vaping products. These vetoes stand.

¶109 ANN WALSH BRADLEY, J. *(concurring in part, dissenting in part).* In an important case like this, where the people of Wisconsin need clarity, we instead sow confusion. Evidence of the lack of clarity is highlighted by the very fact that this case has generated four separate writings with various rationales. And not one of them has garnered a majority vote of this court. Thus, we are left with no clear controlling rationale or test for the future.

¶110 I agree with that part of the per curiam opinion that upholds the vehicle fee schedule veto. The Governor lawfully used his partial veto power when he altered the amount truck owners must pay to register their vehicles.

¶111 Employing different rationales or tests, the majority of justices err, however, by determining that the other three vetoes at issue are unconstitutional and must be struck down on the basis of arguments neither argued nor briefed by any party. In doing so, Chief Justice Roggensack's concurrence/dissent seeks to create a subjective test that unnecessarily inserts the court into policy disputes between the other branches of government, and is likely to lead to more uncertainty and litigation over partial vetoes by future governors of this state.

¶112 Not only does Chief Justice Roggensack's opinion base this decision on a theory that no party has advanced, but it is also based on a theory that has never been actually applied. The opinion's proffered "topic or subject matter" test morphs into an alternative test as the analysis unfolds. That test eschews the "topic or subject matter" language and instead focuses on an

1

amorphous concept of what was the "legislative idea" behind the bill. Both iterations of the test invite manipulation and inject subjectivity into what was once a clearly objective test. Such subjective and manipulative determinations have no place in addressing the important question of the constitutionality of the use of the governor's partial veto power.

¶113 Justice Kelly's concurrence/dissent suffers from the same infirmity as does Chief Justice Roggensack's: it, too, embraces a test neither advanced by any party nor ever applied in any case. Advocating for invalidating all four vetoes at issue, Justice Kelly's writing would overrule or modify a multitude of cases, spanning 85 years of precedent, and would render two constitutional amendments superfluous.

¶114 Likewise, Justice Hagedorn's concurrence relies on a theory not argued by the parties. The opinion would "revisit" and overrule a number of precedential cases. It also injects subjectivity into the determination of the constitutionality of an exercise of the partial veto power, ultimately determining that three of the four vetoes are unconstitutional.

¶115 Rather than embrace tests neither previously argued nor applied, I would instead turn to and uphold our well-established precedent. It recognizes, time and again, that the Wisconsin governor's veto power is incredibly broad. Contrary to the determinations based on untested theories set forth in the various separate writings, I conclude that our precedent inexorably leads to the determination that all four vetoes at issue, including the Governor's vetoes related to the school bus modernization fund,

2

local road improvement fund, and vapor products tax are constitutionally permissible exercises of the partial veto power.

¶116 Accordingly, I concur in part and dissent in part to the per curiam opinion.

I

¶117 Petitioners brought this case as an original action against Governor Tony Evers, seeking to invalidate four partial vetoes the Governor made to the 2019-21 biennial budget bill. They asked this court to determine whether under the partial veto power as granted by the Wisconsin Constitution[1] the governor may permissibly strike portions of a law that are "essential, integral, and interdependent parts of those which were approved." Additionally, they ask us to address whether the governor may strike words so as to transform the meaning and purpose of a law, essentially turning it into a different law.

¶118 The argument petitioners made rested on the assertion that this court should overrule a laundry list of longstanding precedents regarding the governor's partial veto power. However, they focus their discussion on two specific cases, State ex rel. Wisconsin Telephone Co. v. Henry, 218 Wis. 302, 260 N.W. 486 (1935), and State ex rel. Kleczka v. Conta, 82 Wis. 2d 679, 264

---

[1] Pursuant to Article V, § 10(1)(b) of the Wisconsin Constitution, "Appropriation bills may be approved in whole or in part by the governor, and the part approved shall become law."

3

N.W.2d 539 (1978). Petitioners readily acknowledge that without overruling our long-term precedents, their argument cannot stand.[2]

¶119 Chief Justice Roggensack's opinion declines to overrule any of our precedents and upholds only two of the vetoes at issue. Chief Justice Roggensack's concurrence/dissent, ¶¶71, 82. In contrast, Justice Kelly's concurrence/dissent would affect a sea change in the law, overruling or modifying multiple cases and upholding none of the four vetoes at issue. Justice Hagedorn's concurrence would "revisit" some of our prior cases (although it does not say which ones), and would strike down three of the vetoes at issue while upholding one. I address each opinion in turn.

II

¶120 Chief Justice Roggensack's opinion grounds its analysis with a citation to State ex rel. Wisconsin Senate v. Thompson, 144 Wis. 2d 429, 437, 424 N.W.2d 385 (1988), asserting that Wisconsin Senate "explained that the consequences of any partial veto must be a law that remains consistent with the topic or subject matter of the 'whole' bill." Chief Justice Roggensack's concurrence/dissent, ¶60. The actual language of Wisconsin Senate sets forth that "the consequences of any partial veto must be a

---

[2] At oral argument, counsel for Petitioners acknowledged that accepting Petitioners' position would require the court to overrule several cases, which include: State ex rel. Wis. Tel. Co. v. Henry, 218 Wis. 302, 260 N.W. 486 (1935); State ex rel. Martin v. Zimmerman, 233 Wis. 442, 289 N.W. 662 (1940); State ex rel. Sundby v. Adamany, 71 Wis. 2d 118, 237 N.W.2d 910 (1976); State ex rel. Kleczka v. Conta, 82 Wis. 2d 679, 264 N.W.2d 539 (1978); State ex rel. Wis. Senate v. Thompson, 144 Wis. 2d 429, 424 N.W.2d 385 (1988); and Citizens Util. Bd. v. Klauser, 194 Wis. 2d 484, 534 N.W.2d 608 (1995).

4

law that is germane to the topic or subject matter of the vetoed provisions." Wis. Senate, 144 Wis. 2d at 437.

¶121 In the opinion's view, the vetoes that "change the school bus modernization fund into an alternative fuel fund" and "change the local road improvement fund into a fund for local grants or local supplements" fail this inquiry. Chief Justice Roggensack's concurrence/dissent, ¶11. The school bus modernization fund veto altered the original law's topic or subject matter because, as the opinion posits, "the enrolled bill says nothing about an 'alternative fuel fund.' The parts of the enrolled bill that remain after this veto have nothing to do with school buses; indeed, the remaining part has nothing to do with schools or even education." Id., ¶99.

¶122 Similarly, Chief Justice Roggensack's opinion views the local road improvement fund veto as altering the topic or subject matter of the original law as passed by the legislature. It contends that "[a] general undirected fund was not part of a fund created to improve local roads because a general fund can be spent on virtually any subject, i.e., topics and subject matters never considered by the legislature." Id., ¶103. Consequently, the opinion concludes that these two vetoes are an unconstitutional use of the governor's partial veto and are thus invalid.

¶123 The first problem with this approach is that no party advocated for it. Thus, it has not been tested by the rigors of appellate advocacy, i.e., briefing and oral argument. Deciding a case based on a theory not argued by any party not only blindsides the parties and sidesteps their input, but it also too often

5

results in an inadequate guidance and ill-conceived legal analysis. Yet Chief Justice Roggensack's opinion, on its own, selects language from the Wisconsin Senate opinion that never before has been the basis of a partial veto decision, rewords it, and runs with it.

¶124 In Wisconsin Senate, the court wrote:

> We also accept, and for the first time in this case give explicit judicial recognition to, the long-standing practical and administrative interpretation or modus vivendi between governors and legislatures, that the consequences of any partial veto must be a law that is germane to the topic or subject matter of the vetoed provisions.

Wis. Senate, 144 Wis. 2d at 437.

¶125 The opinion claims that it breaks no new ground. Chief Justice Roggensack's concurrence/dissent, ¶107. But neither Wisconsin Senate nor any other case has been explicitly decided based on the "topic or subject matter" limitation the Wisconsin Senate court referred to as "germaneness." In other words, no veto has ever been struck down because the resulting law is not related to the topic or subject matter of the original law.

¶126 To support its rationale, the opinion cites three instances where the topic or subject matter limitation, "sometimes referred to as germaneness," has been "discussed" in prior cases: Wisconsin Senate, 144 Wis. 2d at 451-52, Risser v. Klauser, 207 Wis. 2d 176, 183, 558 N.W.2d 108 (1997), and Citizens Utility Board v. Klauser, 194 Wis. 2d 484, 506, 534 N.W.2d 608 (1995). Chief Justice Roggensack's concurrence/dissent, ¶107. However, none of these cases used topic or subject matter as a reason for striking down a partial veto.

6

¶127 Although the Wisconsin Senate court stated the limitation that "the consequences of any partial veto must be a law that is germane to the topic or subject matter of the vetoed provisions[,]" it ultimately held that "the governor may . . . veto individual words, letters and digits, and also may reduce appropriations by striking digits, as long as what remains after veto is a complete, entire, and workable law." Wis. Senate, 144 Wis. 2d at 437. Wisconsin Senate does not give any examples of what is "germane to the topic or subject matter of the vetoed provisions" and what is not. See id. It further does not provide any guidance in making such a determination.

¶128 In Risser, the court merely cites in passing that "the disapproval of part of an appropriation bill may not result in a provision which is 'totally new, unrelated or non-germane' to the original bill." Risser, 207 Wis. 2d at 183 (citing Wis. Senate, 144 Wis. 2d at 451-53). However, it did not include any analysis of germaneness.

¶129 In Citizens Utility Board, the court provided a cursory analysis of topic or subject matter ("germaneness"), but it was limited to the following:

> There also can be no dispute that sec. 15 of 1993 Senate Bill 44, as partially vetoed by the governor, survives the "topicality" or "germaneness" requirement as set forth in Wisconsin Senate. The new provision approved by the governor——"$250,000"——relates to the same subject matter as the original legislative enactment, viz., a money appropriation to be utilized by CUB as a public interest advocacy entity.

Citizens Util. Bd., 194 Wis. 2d at 505. Again, little can be gleaned from this regarding the meaning of Wisconsin Senate's

7

germaneness limitation, which the opinion terms "topic or subject matter."

¶130 Far from supporting the argument presented in the opinion, these cases serve to demonstrate the novelty of its theory. Although Wisconsin Senate articulated the "germaneness" limitation, no case has rejected a gubernatorial partial veto for defying it or even truly defined what it means. Rather than "breaking no new ground," Chief Justice Roggensack's opinion thus bases its decision on a scantily referenced limitation, rewords it, and attempts to transform it into the dispositive test for a partial veto analysis. If this court is to address the meaning of the "germaneness" language in Wisconsin Senate, we should wait for a case where the parties present the issue rather than raise it of our own accord without the benefit of advocacy.

¶131 The second problem with the approach advanced in the opinion is that it provides no clarity where clarity is sorely needed. The proffered "topic or subject matter" test morphs into an alternative test as the analysis unfolds. The alternative test eschews the "topic or subject matter" language and instead focuses on an amorphous concept of what was the "legislative idea that initiated the enrolled bill." Chief Justice Roggensack's concurrence/dissent, ¶11. But neither test provides any guidance at all. Further, such alternatives will surely breed more litigation regarding what test to apply and the meaning of such

8

terms as "topic," "subject matter," or "legislative idea" behind an enrolled bill.[3]

¶132 Previous cases are clear that in evaluating the constitutionality of a governor's exercise of the partial veto, we apply an objective test. Premised on the language of our state constitution, this "objective test permit[s] the affirmative use of the partial veto power as long as the parts remaining after the veto are a complete and workable law." Wis. Senate, 144 Wis. 2d at 453.

¶133 Chief Justice Roggensack's opinion's approach moves away from an objective analysis, and exposes determinations on the constitutionality of a partial veto to the subjective preferences of judges. To explain, the "topic" or "subject matter" of an enrolled bill is subject to manipulation. It is a function of the lens through which the bill is viewed. As the opinion acknowledges, "topic" or "subject matter" can be broadly or narrowly viewed. Chief Justice Roggensack's concurrence/dissent, ¶91 ("Clearly, the evaluation of 'part' and 'whole' in § 10(1)(b) depends on how broadly the topic or subject matter is defined.").

¶134 Favoring a narrow interpretation of "topic," the opinion states with respect to the school bus modernization fund veto: "The parts of the enrolled bill that remain after this veto have

---

[3] To further illustrate the amorphous concept of "the legislative idea that initiated the enrolled bill," an image comes to mind: two legislators, after hours, are sitting at a local pub across the street from the state capitol. As one drinks a beer, he looks at his fellow legislator, announcing, "Hey, I have an idea." Who knows whose idea and what kind of idea will meet this amorphous "legislative idea" test, and the opinion fails to explain.

nothing to do with school buses; indeed, the remaining part has nothing to do with schools or even education." Id., ¶99.

¶135 But through a broad lens, the "topic" or "subject matter" of the bill changes. The "topic" or "subject matter" of the legislation could easily be viewed as not school buses specifically, but vehicle efficiency generally. Through this lens, the remaining alternative fuel provision is surely "germane" to the "topic" or "subject matter" of the legislation.

¶136 Similarly, the local road improvement fund veto is characterized by the opinion as the creation of a "general undirected fund" that "was not part of a fund created to improve local roads because a general fund can be spent on virtually any subject, i.e., topics and subject matters never considered by the legislature." Id., ¶103. But is the "topic" or "subject matter" of the original legislation local road improvement specifically or the appropriation of money to localities generally? Both are reasonable readings, and deciding between the two requires a subjective determination.

¶137 The approach of Chief Justice Roggensack's opinion has taken an area of Wisconsin law that has been quite clear and based on an objective test, and injected it with subjectivity. Our case law clearly indicates that the governor has a constitutional partial veto power that is broad, in fact much broader than that provided by other states. Wis. Senate, 144 Wis. 2d at 439-40 (citing Henry, 218 Wis. at 313); see also John S. Wietzer, The Wisconsin Partial Veto: Where Are We and How Did We Get Here? The Definition of "Part" and the Test of Severability, 76 Marq. L.

Rev. 625, 645-46 (1993) (referring to Wisconsin's partial veto power as "uniquely broad"); Anthony S. Earl, Personal Reflections on the Partial Veto, 77 Marq. L. Rev. 437, 438 (1994) (discussing the governor's "broad power to veto parts of appropriation bills").

¶138 Yet the opinion exposes that broad veto power to the serendipity of what lens the judge subjectively chooses. This would have the effect of inevitably inserting the court into policy disputes between the other branches of government, a result this court has previously considered undesirable. See State ex rel. Sundby v. Adamany, 71 Wis. 2d 118, 134, 237 N.W.2d 910 (1976) (rejecting the argument that an affirmative policy change constitutes an unconstitutional use of the partial veto power).

¶139 A commentator has correctly observed three reasons for steering clear of subjective considerations in the evaluation of the constitutionality of partial vetoes. See Wietzer, supra, at 648. First, "a subjective test for partial veto validity would foster uncertainty in the legislative process . . . ." Id. Second, "subjective tests would place the court between the executive and the legislature, with the court assuming legislative powers . . . ." Id. Finally, "a subjective test would involve the courts every time a partial veto dispute arose." Id.

¶140 These concerns ring true. Indeed, the budgeting process of this state benefits from certainty. However, Chief Justice Roggensack's opinion takes us farther from that goal. It leaves every partial veto subject to challenge by litigation, where pursuant to the opinion's approach, judges can manipulate the

11

result by injecting their subjective policy preferences into the analysis of the constitutionality of a partial veto.

III

¶141 I turn next to address Justice Kelly's opinion, which invalidates all four vetoes. It proposes "that we respect the constitution's structural limitations on what it means for a bill to be approved 'in part.'" Justice Kelly's concurrence/dissent, ¶217. Accordingly, Justice Kelly's writing suggests that we add to the current "complete, entire, and workable law" test: "After exercising the partial veto, the remaining part of the bill must not only be a 'complete, entire, and workable law,' it must also be a law on which the legislature actually voted; and the part of the bill not approved must be one of the proposed laws in the bill's collection." Id.

¶142 This approach suffers from several infirmities. First, it embraces a test not argued or briefed by either party. Thus, it has not had the benefit of being tested by the fires of advocacy.

¶143 Second, it cavalierly discards and overrules or modifies multiple cases constituting 85 years of precedent in derogation of the doctrine of stare decisis.[4] It would abandon our partial veto precedent because Justice Kelly deems our precedent, in his view, "wrongly decided." Id., ¶206. I would take a more modest approach.

---

[4] Justice Kelly's opinion would overrule Sundby, 71 Wis. 2d 118; Kleczka, 82 Wis. 2d 679; Wisconsin Senate, 144 Wis. 2d 429; Citizens Utility Board, 194 Wis. 2d 484; and Risser v. Klauser, 207 Wis. 2d 176, 558 N.W.2d 108 (1997); and would modify Henry, 218 Wis. 302. Justice Kelly's concurrence/dissent, ¶230 n.14.

12

¶144 Stare decisis, the principle that requires courts to "stand by things decided," is fundamental to the rule of law. Johnson Controls, Inc. v. Emp'rs Ins. of Wausau, 2003 WI 108, ¶94, 264 Wis. 2d 60, 665 N.W.2d 257. "This court follows the doctrine of stare decisis scrupulously because of our abiding respect for the rule of law." Id.

¶145 "Fidelity to precedent ensures that existing law will not be abandoned lightly. When existing law is open to revision in every case, deciding cases becomes a mere exercise of judicial will, with arbitrary and unpredictable results." Hinrichs v. DOW Chem. Co., 2020 WI 2, ¶67, 389 Wis. 2d 669, 937 N.W.2d 37 (quoting Schultz v. Natwick, 2002 WI 125, ¶37, 257 Wis. 2d 19, 653 N.W.2d 266). As a result, any departure from stare decisis requires "special justification." Id. Simple disagreement with a prior court's rationale is not such a "special justification." Progressive N. Ins. Co. v. Romanshek, 2005 WI 67, ¶46, 281 Wis. 2d 300, 697 N.W.2d 417.

¶146 Third, the interpretation advanced by Justice Kelly's opinion would render constitutional language superfluous. Specifically, the language added to the partial veto provision by constitutional amendments in 1990 and 2008 would have no effect under the position the opinion takes.

¶147 The people of Wisconsin have twice limited the partial veto power by constitutional amendment. Enacted in 1990 and 2008, the sum total of these amendments is provided in Article V, Section 10(1)(c) of the state constitution: "In approving an appropriation bill in part, the governor may not create a new word by rejecting

13

individual letters in the words of the enrolled bill, and may not create a new sentence by combining parts of 2 or more sentences of the enrolled bill."

¶148 Under the interpretation espoused by Justice Kelly's opinion, this language has no effect. If, as the opinion posits, the part of the bill not approved must "be one of the proposed laws in the bill's collection," then what would be the need to proscribe the creation of new words or new sentences as set forth in Article V, Section 10(1)(c)? If Article V, Section 10(1)(b) already prohibits the vetoes described in section 10(1)(c), the language of section 10(1)(c) is mere surplusage.

¶149 We are to construe constitutional provisions "to give effect to each and every word, clause and sentence" and to avoid rendering any language superfluous. Wagner v. Milwaukee Cty. Election Comm'n, 2003 WI 103, ¶33, 263 Wis. 2d 709, 666 N.W.2d 816 (internal quotation and citation omitted). The interpretation advanced in the opinion runs directly counter to this established mode of constitutional interpretation.

¶150 Finally, Justice Kelly's opinion posits that the court has gone astray by "compar[ing] our partial veto to the 'line-item' vetoes adopted by some of our sister states and, assuming the different words meant Wisconsin must have done something very much different from the others, we consulted them no further." Justice Kelly's concurrence/dissent, ¶182. Yet there is a difference between a "partial" and an "item" veto, as our precedent recognizes. Wis. Senate, 144 Wis. 2d at 439-40 (citing Henry, 218 Wis. at 313). The opinion does not account for the difference and

14

would, as a practical matter, result in an "item" veto in spite of Wisconsin's unique constitutional language.

IV

¶151 Next, I turn to address Justice Hagedorn's opinion, which concludes that three of the vetoes at issue are unconstitutional and that one, the vehicle fee schedule veto, passes constitutional muster. After disavowing each test proposed by both the parties and members of this court, the opinion states that "[w]hile future litigation will surely provide opportunities to refine the analysis, the principles derived from our constitutional text, structure, and early cases draw sufficient lines to decide this case." Justice Hagedorn's concurrence, ¶264.

¶152 Those principles lead Justice Hagedorn's opinion to this essential inquiry: "whether the governor vetoed a policy the legislature proposed and passed, which is permissible, or created a new policy the legislature did not propose or pass, which is not." Id., ¶263. "[W]hat the governor may not do is selectively edit parts of a bill to create a new policy that was not proposed by the legislature. He may negate separable proposals actually made, but he may not create new proposals not presented in the bill." Id., ¶264. In the opinion's view, all of the subject vetoes with the exception of the vehicle fee schedule veto fail this inquiry.

¶153 Justice Hagedorn's writing suffers from several analytical shortcomings. First, like both Chief Justice Roggensack's opinion and Justice Kelly's opinion, it advances a theory not specifically argued by any party. Indeed, the opinion

15

explicitly disavows each test proposed by the parties in this case. Id., ¶¶259-63. Thus, the parties are deprived of the opportunity to analyze and offer comment on this proposed theory.

¶154 Second, although the opinion appears reticent to say so, it would discard a significant amount of our precedent. Justice Hagedorn's opinion would keep Henry intact, but would "revisit" our "later cases . . . insofar as they abandoned the core principles undergirding the way laws are made pursuant to our constitution." Id., ¶266.

¶155 Which of the court's "later cases" must be "revisited?" In a footnote, the opinion reveals that Kleczka is one of these cases, and that it must be overruled rather than merely "revisited." Id., ¶266 n.11. But the opinion also calls into question the entirety of our partial veto jurisprudence. It asserts that "[i]nsofar as our later decisions have treated Kleczka as pronouncing that a veto shall stand simply if it leaves a complete, entire, and workable law, these statements too must be withdrawn." Id.

¶156 Yet, our court has never applied any test other than the "complete, entire, and workable law" test. Thus, although obscured in a footnote, Justice Hagedorn's opinion would tear down a substantial amount of our precedent. As explained above, such a position disregards the principle of stare decisis, which is essential to the rule of law. Johnson Controls, 264 Wis. 2d 60, ¶94.

¶157 Third, Justice Hagedorn's proposed test injects an element of subjectivity into partial veto decisions. In the

16

opinion's view, the essential inquiry is "whether the governor vetoed a policy the legislature proposed and passed, which is permissible, or created a new policy the legislature did not propose or pass, which is not." Justice Hagedorn's concurrence, ¶263. As with the test proposed in Chief Justice Roggensack's writing, such an inquiry is susceptible to manipulation and to the subjective preferences of judges. The "policy" of a proposed bill is just as amorphous as the "topic or subject matter" of the proposed bill.

¶158 For example, with regard to the school bus modernization veto, Justice Hagedorn's opinion suggests that "[t]he legislature's budget bill did not propose an appropriation in whole or in part for alternative fuels generally. Instead, the legislature proposed an appropriation for the replacement of school buses." Id., ¶271. Again, what the "policy proposal" is depends on the lens through which the bill is viewed. See supra, ¶¶134-35.

¶159 By asserting that "future litigation will surely provide opportunities to refine the analysis," Justice Hagedorn acknowledges the instability in the rule of law that these separate writings generated. Justice Hagedorn's concurrence, ¶264. Without a clear rule, how will future courts know how to apply this law? They won't. How can governors be assured that the partial veto they are crafting is constitutional? They can't. What is to happen if money has been paid or contracts signed based on the statutory language as it currently exists? Those who would strike down the vetoes provide no guidance.

17

¶160 Indeed, there will be future cases needed to iron out the wrinkled mess we leave to the people of this state as this court's partial veto jurisprudence.

V

¶161 Instead of Chief Justice Roggensack's approach that would inject subjectivity into an objective test, Justice Kelly's approach that would discard decades of case law, or Justice Hagedorn's approach that would do both, I would apply the time-honored test informed by our precedent. That is, we ask whether "the part of the bill remaining constitutes a 'complete, entire, and workable law.'" Risser, 207 Wis. 2d at 183 (citing Henry, 218 Wis. at 314; State ex rel. Martin v. Zimmerman, 233 Wis. 442, 450, 289 N.W. 662 (1940)); see Wis. Senate, 144 Wis. 2d at 453.

¶162 The resulting law after the school bus modernization veto is clearly complete, entire, and workable.[5] As Chief Justice Roggensack's opinion sets forth, the law after the veto states: "The department shall establish a program to award grants of settlement funds from the appropriation under s. 20.855(4)(h) for alternative fuels." Chief Justice Roggensack's concurrence/dissent, ¶16. This resulting sentence is complete and workable on its face, providing clear direction on administration of the subject grants.

¶163 Likewise, the local road improvement fund veto leaves a complete, entire, and workable law. After the local road improvement veto, § 126 of the budget bill states: "Local

_____

[5] The vehicle fee schedule veto also results in a complete, entire, and workable law, a premise that Petitioners do not dispute. See Chief Justice Roggensack's concurrence/dissent, ¶90.

18

supplement . . . 75,000,000." Id., ¶19. Relatedly, § 184s provides: "Local supplement. From the general fund, as a continuing appropriation, the amounts in the schedule for local grant." Id., ¶20. Although this law does not get high marks for grammar, that does not mean it is not complete and workable. "Awkward phrasing, twisted syntax, alleged incomprehensibility and vagueness are matters to be resolved only on a case-by-case basis in which specific challenges to discrete applications of the new provisions are raised in a complete factual setting." Wis. Senate, 144 Wis. 2d at 463.

¶164 Similarly, the vapor products tax veto results in a complete, entire, and workable law. After the Governor's veto, the definition of "vapor product" is set forth as "a noncombustible product that produces vapor or aerosol for inhalation from the application of a heating element, regardless of whether the liquid or other substance contains nicotine." Chief Justice Roggensack's concurrence/dissent, ¶24. Again, the veto leaves a coherent sentence that is complete, entire, and workable on its face.

¶165 Rather than embrace the novel and untested approaches advanced by each of the other separate opinions, this court should tread lightly and act with restraint. Such approaches foment confusion and inevitably will lead to more litigation.

¶166 The majority of the court likewise engenders more litigation with the relief it affords. The petitioners suggest that if this court finds the vetoes unconstitutional, then we consider as possible relief "remanding to the Governor to allow him to reconsider the relevant sections and either approve them in

19

whole, veto them in whole, or veto them in part consistent with this Court's opinion." Such a suggestion for this court, however, proves to be much too restrained.

¶167 Instead, the court grants an alternative relief, choosing to do an end run around the Governor. The per curiam opinion announces that the school bus modernization fund, local roads improvement fund, and vapor products tax are "in full force and effect as drafted by the legislature." Per curiam, ¶9.

¶168 Arguably, the constitution requires a remand to the Governor. The Wisconsin Constitution provides for only two ways for a bill to become law: if the governor approves and signs the bill, Wis. Const. art. V, § 10(1)(b), or if the legislature overrides the governor's veto. Wis. Const. art. V, § 10(2). Neither occurred here.

¶169 Citing Sundby, 71 Wis. 2d at 125, the per curiam seeks support for the action it takes. Specifically, the Sundby court set forth: "If, in fact, the partial vetoes are invalid, the secretary of state has a mandatory duty to publish those sections of the enactment as if they had not been vetoed." Id. However, the statement in Sundby is not accompanied by any constitutional analysis and comes in the context of deciding whether the secretary of state was a proper party. That's a pretty slim reed to use as support for the constitutionally questionable relief the majority grants.

¶170 The people of this state deserve stability in the law and clarity in our opinions. This court should uphold and follow our well-established precedent. Based on that precedent and the

test it establishes, I determine that all four vetoes at issue should be upheld because they result in objectively complete, entire, and workable laws.

¶171 For the foregoing reasons, I concur in part and dissent in part.

¶172 I am authorized to state that Justice REBECCA FRANK DALLET joins this concurrence/dissent.

¶173 DANIEL KELLY, J. *(concurring in part, dissenting in part).* What a vexatious thing the word "part" can be, and indeed it has vexed us from the day we encountered it in Article V of our constitution. When we first considered what it means for a governor to approve an appropriation bill "in part," we supposed the people of Wisconsin had adopted something very much unlike the "line-item veto" many of our sister states have adopted. Our supposing caused us to dress up the governor as the people's legislative agent (with respect to appropriations bills) and the legislature as the owner of an exceedingly difficult to deploy veto. So now appropriation "bills" may originate with the governor, and they must surely become law unless a super-majority of both legislative houses say otherwise. Not because the <u>constitution</u> says this is how an appropriative law may come to be, but because <u>we</u> have said so. And this we have done in obeisance to a single word, a word of merely serviceable merit in the ordinary affairs of life, but on which we have conferred the gigantic power to swap the governor for the legislature when an appropriation is under consideration.

¶174 The balance of my discourse, I trust, will accomplish three things. First, I mean to describe the mechanism provided by the constitution for the enactment of laws. Second, I will recount how our partial-veto jurisprudence has completely disassembled that mechanism and reconstructed it with the parts all out of place. And third, I will propose we retire our suppositions and instead consult the constitution's actual text to learn what it means for a governor to approve an appropriation bill "in part."

1

I. SCHOOLHOUSE ROCK

¶175 A law begins as someone's idea. Somewhere, for some often-unknown reason, it strikes someone that something within the government's purview ought to be required, or prohibited, or changed. Through whatever pathways the idea might travel, it eventually comes to the attention of a legislator. And if the idea finds there a receptive audience, the legislator engages the constitutional mechanism for turning the idea into a law. It must be a legislator (as opposed to, say, the governor) because the power to make the law is legislative. Schmidt v. Dep't of Res. Dev., 39 Wis. 2d 46, 59, 158 N.W.2d 306 (1968) (The legislative power is the power "'to declare whether or not there shall be a law; to determine the general purpose or policy to be achieved by the law; [and] to fix the limits within which the law shall operate[.]'" (quoting State ex rel. Wis. Inspection Bureau v. Whitman, 196 Wis. 472, 505, 220 N.W. 929 (1928))); see also Wis. Legislature v. Palm, 2020 WI 42, ¶92, 391 Wis. 2d 497, 942 N.W.2d 900 (Kelly, J., concurring) (describing the legislative power as the ability to determine and declare what the laws and policy of the state will be). And according to the unambiguous and unqualified command of our constitution, "[t]he legislative power [is] vested in a senate and assembly." Wis. Const. art. IV, § 1.

¶176 The legislative process must begin with the drafting of a bill to contain the championed idea because "[n]o law shall be enacted except by bill." Wis. Const. art. IV, §17(2). When the drafting is done, the bill contains a complete and workable

2

potential law, which is then introduced to the legislature: "Any bill may originate in either house of the legislature . . . ." Wis. Const. art. IV, § 19 (the "origination clause"). There is, obviously, correspondence between the houses because a bill cannot become a law until approved by both: "Every bill which shall have passed the legislature shall, before it becomes a law, be presented to the governor." Wis. Const. art. V, § 10(1)(a) (the first clause is the "legislative passage clause," and the second is the "presentment clause"). And in that correspondence, each house may modify the proposed law considered by the other. Wis. Const. art. IV, § 19 ("[A] bill passed by one house may be amended by the other.") (the "amendment clause").

¶177 Once both houses have agreed upon a bill, it comes under the governor's scrutiny as it passes from the legislative branch to the executive branch. Wis. Const. art. V, § 10(1)(a). The bill becomes a law "[i]f the governor approves and signs the bill . . . ." Wis. Const. art. V, § 10(1)(b). The process for appropriation bills (which is our particular topic of interest here) is, however, a little different. Such bills "may be approved in whole or in part by the governor, and the part approved shall become law." Id. But the governor's disapproval of some part of an appropriation bill does not necessarily identify its terminus. Instead, the rejected part returns to the legislative branch for further consideration. If two-thirds of the members of both houses approve, the rejected part becomes law notwithstanding the governor's disapproval.[1]

---

[1] Wis. Const. art. V, § 10(2)(b):

3

¶178 I beg forgiveness for this pedantry, but I find that our partial veto jurisprudence requires recourse to these fundamental principles so that we may recover the law-making process provided by our constitution. We have before us two potential understandings of what it means to approve an appropriations bill "in part." One is extraordinarily broad, and in consequence of its broadness it rejects almost every other piece of the legislative machinery described in our constitution. The other is much more modest, but has the benefit of leaving the pieces of the legislative machinery where the constitution put them, and in its operation it precisely answers the problem it was meant to solve.

¶179 I believe we should adopt the latter understanding in no small part because one of the fundamental rules of textual interpretation is that, when given a choice, we do not read one constitutional provision to conflict with others. See Thomas M. Cooley, A Treatise on the Constitutional Limitations Which Rest upon the Legislative Power of the States of the American Union, 58 (1868) ("[O]ne part is not to be allowed to defeat, if by any

---

The rejected part of an appropriation bill, together with the governor's objections in writing, shall be returned to the house in which the bill originated. The house of origin shall enter the objections at large upon the journal and proceed to reconsider the rejected part of the appropriation bill. If, after such reconsideration, two-thirds of the members present agree to approve the rejected part notwithstanding the objections of the governor, it shall be sent, together with the objections, to the other house, by which it shall likewise be reconsidered, and if approved by two-thirds of the members present the rejected part shall become law.

4

reasonable construction the two can be made to stand together.");
Antonin Scalia & Bryan A. Garner, Reading Law:  The Interpretation
of Legal Texts 180 (2012) ("The provisions of a text should be
interpreted in a way that renders them compatible, not
contradictory.").  So we construe constitutional provisions with
the assumption that they are all supposed to function together in
concert.  When faced with two permissible constructions of the
word "part," we must choose the one that harmonizes with other
relevant text.  A reading that introduces dissonance is a powerful
hint that we're doing it wrong.

¶180 The tuning fork by which I will test for harmony and
dissonance comprises three interrelated propositions called forth
by our constitution's text.  The first proposition is that the
most elemental part of a bill is an idea (that is, a proposal for
a complete, entire, and workable law).  The second is that the
powers of amending and vetoing are different things, the respective
exercise of which our constitution commits to different branches
of government.  And the third is that an idea may not become law
without the legislature having first voted for it.  It seems
remarkable to me that I should be offering these as propositions
rather than as settled descriptions of constitutional principles,
but our partial-veto jurisprudence is at odds with each of them.
And that means all I can do is recommend them to the attention of
future courts who may be called upon to consider the meaning of
Wis. Const. art. V, § 10.

## II. ON THE JUMBLING OF THE LEGISLATIVE MECHANISM

¶181 Great variances often begin as minor imprecisions, and such is the case with the path we traveled over the years as we addressed the partial veto. I will detail only enough of that journey to describe how we disassembled some of the key pieces of the legislative mechanism and then reassembled them into something that is constitutionally unrecognizable.

### A. The Disassembly

¶182 We first entertained a claim that the governor had improperly employed his partial veto power in State ex rel. Wisconsin Tel. Co. v. Henry, 218 Wis. 302, 260 N.W 486 (1935). Having never encountered such a veto before, we sensibly looked about for tools to help us understand its telos. Our first step was to compare our partial veto to the "line-item" vetoes adopted by some of our sister states and, assuming the different words meant Wisconsin must have done something very much different from the others, we consulted them no further. It was certainly fair to observe that a partial veto must differ in some measure from a line-item veto——the word-choice suggests as much. But it was a mistake to suppose the measure of difference was so great that other states' experience with vetoes of less than an entire bill could tell us nothing about their impact on the overall law-making mechanism. So we missed out on what we might have learned about whether such vetoes have any effect on the vesting of legislative authority, or the origination of bills, or the difference between amendments and vetoes, or the need for the legislature to vote on a proposed law. Finding no pedagogical value in the partial veto's

6

cousin, we instead consulted a dictionary wherein, unknowingly, we found mischief.

¶183 We learned from Webster's New International Dictionary that "part" means

> one of the portions, equal or unequal, into which anything is divided, or regarded as divided; something less than a whole; a number, quantity, mass, or the like, regarded as going to make up, with others or another, a large number, quantity, mass, etc., whether actually separate or not; a piece, fragment, fraction, member, or constituent.

Henry, 218 Wis. at 313 (quoting Part Webster's New International Dictionary 1781 (2d ed. 1934)). This provided a reasonably adequate etymological meaning;[2] but what we needed was a constitutionally contextualized meaning. Antonin Scalia & Bryan A. Garner, supra at 427 (We consider a word's meaning "in context according to a fair reading."). That is, we needed to discover the most elemental part of a bill, the further subdivision of which leaves something no longer identifiable as a part of a bill. If we had done this work then, it would have saved us from concluding in subsequent cases (which I address below) that the most elemental part of a bill is not an idea, but instead a letter or a digit.

¶184 But we did not know then what would be urged upon us later, and so our analysis in Henry was adequate for our immediate needs, if not for future cases. All we needed to do there was decide whether the partial veto empowered the governor to unbundle what the legislature had bundled——a practice then known as

_____

[2] A common, contemporaneous dictionary may provide a word's generally understood meaning. State v. Sample, 215 Wis. 2d 487, 499–500, 573 N.W.2d 187 (1998).

7

"logrolling." A case we decided a few years later neatly summed up the relationship between the problem and the solution provided by the partial veto:

> Its purpose [the partial veto] was to prevent, if possible, the adoption of omnibus appropriation bills, log-rolling, the practice of jumbling together in one act inconsistent subjects in order to force a passage by uniting minorities with different interests when the particular provisions could not pass on their separate merits, with riders of objectionable legislation attached to general appropriation bills in order to force the governor to veto the entire bill and thus stop the wheels of government or approve the obnoxious act. Very definite evils were inherent in the law-making processes in connection with appropriation measures. Both the legislature and the people deemed it advisable to confer power upon the governor to approve appropriation bills in whole or in part . . . .

State ex rel. Martin v. Zimmerman, 233 Wis. 442, 447-48, 289 N.W. 662 (1940). We foreshadowed this conclusion in Henry where we observed that "there is nothing in that provision [art. V, § 10] which warrants the inference or conclusion that the Governor's power of partial veto was not intended to be as coextensive as the Legislature's power to join and enact separable pieces of legislation in an appropriation bill." 218 Wis. at 315. The rule we developed in Henry was sufficient to meet the problem of logrolling. It required that the parts of the bill remaining after the partial veto "constitute, in and by themselves, a complete, entire, and workable law . . . ." Id. at 314. Applied in this context, it was a workable rule because its operation reflected the partial veto's purpose——separating ideas the legislature had joined. Unfortunately, embedded in this rule is an intrinsic deficiency: We had neglected to say that the "complete, entire,

8

and workable law" remaining after the veto must be one on which the legislature had actually voted. The deficiency was not apparent in Henry because the parts of the bill remaining after the veto were the same as they had been when transmitted to the governor. What we didn't foresee at the time was that a future governor might so employ the partial veto that the remaining parts would comprise a law the legislature had never seen.

¶185 The rule's deficiency bore fruit in State ex rel. Sundby v. Adamany, 71 Wis. 2d 118, 237 N.W.2d 910 (1976). There, the bill in question gave local taxpayers the option of calling for a public referendum before a municipality increased its tax levy. Id. at 121-22. But the governor vetoed part of one sentence in such a way that the remaining language made the referendum mandatory. The legislature, of course, had neither proposed nor approved such a thing. The idea had not been drafted as a bill, it did not originate in the senate or assembly, it was not subject to amendment in the corresponding legislative house, and no one in the legislature had ever voted on it. And yet we said the gubernatorial-authored law was constitutionally permissible. Why? Because, apparently, a veto has affirmative policy-making powers:

> Some argument is advanced that in the exercise of the item veto the governor can negative what the legislature has done but not bring about an affirmative change in the result intended by the legislature. We are not impressed by this argued distinction. Every veto has both a negative and affirmative ring about it. There is always a change of policy involved. We think the constitutional requisites of art. V, sec. 10, fully anticipate that the governor's action may alter the policy as written in the bill sent to the governor by the legislature.

9

Sundby, 71 Wis. 2d at 134 (emphasis added). Every veto has an affirmative "ring" about it? Well, I suppose so, but only in the sense that declining a marriage proposal has the "ring" of a wedding about it. A veto cannot be the genesis of a new policy any more than telling an amorous suitor "no" means there is a reception to plan. Vetoes and "noes" are for stopping things, not creating them. See Federalist No. 73, 440-41 (Hamilton) (C. Rossiter ed. 1961) (The veto power "is the qualified negative of the [executive] upon the acts or resolutions of the two houses of the legislature; or, in other words, his power of returning all bills with objections, to have the effect of preventing their becoming laws[.]").

¶186 To Chief Justice Roggensack, however, a veto is an invitation to participate in law making rather than just law stopping. She says: "Furthermore, our jurisprudence is not unique in describing a quasi-legislative role for the governor. A veto power, regardless of its contours, is inherently legislative." Chief Justice Roggensack's concurrence/dissent, ¶84. The second sentence is certainly true, but it has no connection to what she means by a "quasi-legislative role" in the first sentence. The veto is simply one of the instances in which our framers broke off a small piece of power that naturally belongs in one branch and put it in another. So, yes, it is quite obviously legislative in nature. But there are no penumbras emanating from the veto power; it authorizes the executive to do nothing more than what it says——stop a law from coming into being. In the Chief Justice's hands, however, the veto is a clandestine vehicle for smuggling the

10

legislature's law-authoring function into the executive branch where, through the power of the word "part," it turns the governor into a quasi-legislator (whatever that might be). If we are to be constrained by the words of the constitution, this operation is simply impossible. So the first sentence of the quote above is incorrect. Our misguided jurisprudence might describe the governor as having a "quasi-legislative role" beyond merely stopping a proposed law, but literally no other authority in these United States does.[3]

¶187 And that brings us back to Henry's unfinished work——defining the "thing" that a partial veto may stop. The rule we adopted in that case assumed, but never stated, that it was a bundled piece of legislation. But without a contextualized definitional anchor point for "part," we concluded in Sundby that the most elemental part of a bill can be something smaller than one of the proposed laws bundled into an appropriation bill; we said it could be part of a sentence in one of the bundled proposals, so long as the resulting document still comprised a "complete,

---

[3] The Chief Justice buttresses the executive's claim to legislative powers with reference to its rule-making authority (which it borrows from the legislature). See Chief Justice Roggensack's concurrence/dissent, ¶86 ("First, as demonstrated by rulemaking, and as we have long concluded, the Legislature may delegate its power to make law to the executive."); Koschkee v. Taylor, 2019 WI 76, ¶34, 387 Wis. 2d 552, 929 N.W.2d 600 ("The source for rulemaking is legislative delegation."). The nature, scope, effect, and validity of administrative rule-making are subjects of a continually growing body of literature that is enormous both in terms of its volume and potential constitutional implications. So this probably isn't the best reference if the goal is to show that executive law-making is a settled and universally accepted phenomenon.

entire, and workable law." So we accepted the veto of a part of a part of an idea even though the result expressed an idea not contained in the bill presented to the governor.

¶188 But wait, there's more. We've said the most elemental part of a bill a veto can stop isn't a sentence, or even part of a sentence——it's a letter or a digit:

> Thus, in this opinion, we break no new ground except as we now, on the facts before us, have the obligation to clarify that the governor may, in the exercise of his partial veto authority over appropriation bills, veto individual words, letters and digits, and also may reduce appropriations by striking digits, as long as what remains after veto is a complete, entire, and workable law.

State ex rel. Wis. Senate v. Thompson, 144 Wis. 2d 429, 437, 424 N.W.2d 385 (1988). In what came to be known as the Vanna White veto, a governor would strike individual letters or numbers to create words, sentences, and ideas that appeared nowhere in the bill passed by the legislature.[4]

¶189 We approved this practice in large part because we considered it all part of the governor's "quasi-legislative" role. Id. at 446. Warming to our theme a few pages later, we dropped

---

[4] See, e.g., State ex rel. Wisconsin Senate v. Thompson, 144 Wis. 2d 429, 460 n.15, 424 N.W.2d 385 (1988):

Governor Lee Sherman Dreyfus used a digit veto to cut $8.9 million appropriated for state school aids in the 1979-81 budget bill. He accomplished this by vetoing the decimal point and number 9 from the percentage "96.9%", thereby decreasing the percentage used for calculating a portion of such school aids. That veto was not challenged, and the legislature subsequently failed to override it.

both the "quasi" and any remaining pretense that the legislature is the exclusive legislative branch of government: "This broad and expansive interpretation of the governor's partial veto authority as mandated by the constitution has, in effect, impelled this court's rejection of any separation of powers-type argument that the governor cannot affirmatively legislate by the use of the partial veto power." Id. at 453.

¶190 After releasing our Wisconsin Senate opinion in 1988, the court-approved method of enacting appropriation bills no longer bore any resemblance to the mechanism described by our constitution. The three propositions I introduced above, and which I now address, demonstrate that our experience in reconstructing the dismantled legislative process left several of the key pieces in the wrong place.

B. The Reassembled Legislative Mechanism

¶191 The first proposition traduced by our partial veto jurisprudence is that the irreducible part of a bill is an idea——that is, a proposal for a complete, entire, and workable law. This is the first because it necessarily informs our understanding of the entire legislative mechanism——specifically, it identifies the required entry point to the legislative process, where and how the idea may be changed, and whose approval is needed before the idea may become a law. However, by treating a bill as a potpourri of letters and digits, rather than an expression of one or more complete and comprehensible ideas, our reconstruction of the legislative mechanism dramatically changed the legislative process.

13

¶192 Our refutation of this proposition started when we looked to a dictionary to learn what "part" means. We had recourse to that venerable source because, surprisingly, we didn't think the context in which the constitution used the word was significant:

> As the meaning of that word, as used in section 10, art. 5, Wis. Const., is not . . . rendered doubtful by reason of context, or uncertainty as to application to a particular subject-matter, or otherwise, there is nothing because of which that word, as used in that section, is not to be given its usual, customary, and accepted meaning . . . .

Henry, 218 Wis. at 313. But it's one thing to understand that a "part" is something less than the whole, as the dictionary says; it's an entirely different thing to understand what a part of a bill might be.

¶193 As we learned in Schoolhouse Rock, a bill encompasses someone's idea. The purpose of the bill, of course, is to introduce the idea it contains to the legislature, where the legislators evaluate its merits as a potential law.[5] The fate of a bill in each legislative house, therefore, is to be the subject of debate. See Wis. Const. art. IV, § 16 (Our constitution anticipates a vigorous debate: "No member of the legislature shall be liable in any civil action, or criminal prosecution whatever, for words spoken in debate."); Legislature—Public Officers—

---

[5] See, e.g., Follow the Process: The Legislative Process, Wisconsin State Legislature (Last Accessed Jun. 13, 2020), https://legis.wisconsin.gov/about/follow ("When a legislator gets an idea or is prompted by their constituency to make a change, they have a drafting lawyer prepare a draft of a bill to see what laws will need to change.").

14

<u>Secretary of State——Wisconsin Statutes</u>, 10 Wis. Op. Att'y Gen. 613 (1921) (Broadly describing the legislative process as an introduction of a bill in one house, potential amendment in the other, and ultimate agreement between them before presentation to the governor). Debates (proper ones, at least) involve reasoning——the setting forth of intelligible arguments for or against a rationally comprehensible proposal. Dividing a bill into anything smaller completely destroys its distinctive nature——that is, the expression of a proposed law susceptible of debate and adoption. This is why the basic part of a bill cannot be a letter or a digit. Neither the letter "y" nor the number "5" (nor any of their relations) can be, in isolation, a bill because such a thing would be incomprehensible in debate or as a law. So the irreducible part of any bill, even the simplest, most uncomplicated, inconsequential bill one can imagine, must necessarily be, at a minimum, an idea expressing a potential complete, entire, and workable law. This is why Justice Hansen said the partial veto "is not a power to reduce a bill to its single phrases, words, letters, digits and punctuation marks." <u>State ex rel. Kleczka v. Conta</u>, 82 Wis. 2d 679, 726, 264 N.W.2d 539 (1978) (Hansen, J., concurring in part, dissenting in part).

¶194 The second proposition is that the powers of amending and vetoing are different things, the respective exercise of which our constitution commits to different branches of government. Amending belongs to the legislative houses: "[A] bill passed by one house may be amended by the other." Wis. Const. art. IV, § 19. The power to amend a bill comprehends changing its meaning:

15

"When a change is made in a bill, it is said to be amended. There are simple and substitute amendments."[6] See also Amend, Black's Law Dictionary (11th ed. 2019) ("To change the wording of; specif., to formally alter (a statute, constitution, motion, etc.) by striking out, inserting, or substituting words.") An amendment may accomplish something as minor as subtracting a penny from an appropriation, as major as introducing an entirely new idea, or quite literally anything in between. Our constitution commits the power to amend to the assembly or senate; it contains no suggestion that the governor might be able to partake of it. This should have given us pause as we were developing our theory of partial vetoes, but instead we rejected the idea that "the governor cannot affirmatively legislate by the use of the partial veto power." Wis. Senate, 144 Wis. 2d at 453. This is patent error because it draws the amending power into the executive branch in direct and express contradiction to the constitution. If we say the governor's "veto" may change a bill's idea, then there's really no cognizable difference between the concepts of amendments and partial vetoes. Because we failed to keep these concepts distinct, our reconstructed legislative mechanism now allows for amendments in the assembly, the senate, and the governor's mansion. Obviously, we put the power to amend in the wrong place as we were reconstructing the legislative mechanism.

---

[6] How a Bill Becomes Law, Wisconsin State Legislature 14 (available at http://legis.wisconsin.gov/assembly/acc/media/1106/howabillbecomeslaw.pdf) (May 2016).

16

¶195 The third (and perhaps most important) proposition is that an idea may not become a law without the legislature having voted for it. But when we finished reassembling the legislative mechanism, this proposition was, disturbingly, no longer categorically true. If a bill contains an appropriation, our reconstruction allows a new idea to originate not as a bill but as a partial veto. It further allows the idea to originate in the executive branch instead of the legislative branch. And, finally, it allows this new idea to become law so long as the legislature does not reject it by a two-thirds vote in both houses. So our reconstruction put more legislative pieces in the wrong place——we made the governor the author of the law (instead of the legislature), and we reduced the legislature to wielding a very difficult to deploy veto over the governor's edict. The net effect is that the governor may create a law without ever having to obtain legislative approval. In fact, a majority of both houses' members may affirmatively reject the governor's law, yet it is law nonetheless unless that majority is super-sized.

¶196 This reconstructed mechanism violates four specific constitutional requirements. The first is that all bills must originate in one of the two legislative houses, the second is that they must be subject to amendment in the corresponding house. Wis. Const. art. IV, § 19 ("Any bill may originate in either house of the legislature, and a bill passed by one house may be amended by the other."). The third is that "[n]o law shall be enacted except by bill," and the fourth is that the bill must be approved by both houses of the legislature. Wis. Const. art. IV, § 17(2); Wis.

17

Const. art. V, § 10(1)(a) ("Every bill which shall have passed the legislature shall, before it becomes a law, be presented to the governor." (emphasis added)). To the extent a governor's partial veto introduces an idea not previously present in the bill, its origin is in the executive branch, not the legislature. And because the new idea did not originate in the assembly or senate, it was never subject to amendment in the corresponding house. Finally——and this should definitively dispose of our partial veto jurisprudence——it allows an idea to become a law even though it has not "passed the legislature."

¶197 Now, to be sure, the judicially-engineered executive legislative power (how's that for a tri-lateral oxymoron?) is not as comprehensive as that belonging to the legislature. We have left some limitations in place, which is encouraging even if they have nothing to do with the constitution. For example, when the governor addresses himself to a dollar figure, we allow him to make it smaller, not larger. Citizens Util. Bd. v. Klauser, 194 Wis. 2d 484, 488, 534 N.W.2d 608 (1995). Presumably, this limit derives from the mathematical principle that $10 is a part of $100. But it still allows introduction of an idea different from the one to which the legislature assented. Another limitation relates to the letters the governor may use in the creation of new words and ideas: We have never said he may add letters not already present in the bill. I suppose this is an etymological limit based on the proposition that a letter (as opposed to an idea) is the indivisible part of a bill, and so a new letter cannot be said to be a part of the existing potpourri. Speaking of which, we have

18

not said (at least not yet) that he may change the order of letters in the potpourri. This limit almost certainly survives because we haven't turned our attention to it. If the governor may create new words and ideas not already present in the bill, it seems like scrupling at a trifle to insist that the letters he uses to create them remain in the order presented. If a letter really is the most elemental part of a bill, it is just as much a "part" if it appears before rather than after any of the bill's other "parts." Nothing in the dictionary definition of "part" suggests that sequencing has anything to do with it. In any event, aside from these few limitations, our cases say the governor is free to draft new ideas and we will pretend the resulting document is still a bill that has "passed the legislature" when, quite obviously, it isn't. As a consequence, our cases refute the proposition that no idea shall become a law without legislative approval.

¶198 So, as far as the Wisconsin Supreme Court is concerned (at least until we were contradicted by a brace of constitutional amendments),[7] because the most elemental part of an appropriations

---

[7] The people of Wisconsin amended their constitution in 1990 to prevent a veto from "creat[ing] a new word by rejecting individual letters in the words of the enrolled bill[.]" Wis. Const. art. V, § 10(1)(c). They amended it again in 2008, this time to prevent a veto from creating "a new sentence by combining parts of 2 or more sentences of the enrolled bill." Id.

The Chief Justice and Justice Ann Walsh Bradley treat these amendments as though they have something to say about the meaning of the original partial veto power. Chief Justice Roggensack's concurrence/dissent, ¶73; Justice Ann Walsh Bradley's concurrence/dissent, ¶146. They don't. These amendments were directed at us; they were meant to rein in our jurisprudential excesses, not limit the meaning of the constitution's actual text.

bill is a letter, a bill may originate with the governor, it is not subject to legislative amendment, and it may become the law of Wisconsin even if the legislature has not approved it (or, more shockingly, has actually affirmatively voted against it, albeit by less than a supermajority).  As Justice Hansen said,

> [i]t appears that we have now arrived at a stage where one person can design his own legislation from the appropriation bills submitted to him after they have been approved by the majority of the legislature. The laws thus designed by one person become the law of the sovereign State of Wisconsin unless disapproved by two-thirds of the legislators. I am not persuaded that art. V, sec. 10, was ever intended to produce such a result.

Kleczka, 82 Wis. 2d at 727 (Hansen, J., concurring in part, dissenting in part).  I agree.  All of this upending of the constitutional order we have done because of the word "part," a word so meek and mild that it should be entirely incapable of wreaking such havoc on our constitutional order.  This case presents an opportunity to return the disordered pieces of the law-making machinery to their proper places, and I think we should take it.  In fact, I think we are required to take it.

III.  ON THE DUTY TO RETURN TO THE CONSTITUTIONAL TEXT

¶199 The majority of the court's members base their analyses on two propositions.  The first is that our decision here must follow what we have done in our prior cases, even if we were wrong before.  And the second is that we must respect the governor and legislature's historical practice of allowing partial vetoes so long as the resulting legislation is either on the same topic as the bill passed by the legislature (according to the Chief Justice), or is a "complete, entire, and workable law" (according

20

to other members of our court). I disagree because I believe our obligation to the Wisconsin Constitution supersedes both of them. I appreciate the Chief Justice's opinion because she attempts to cabin in the governor's use of the partial veto so that the resulting law is at least on the same topic, and in doing so she moves at least part of the way back to the constitutional limitations on the partial veto. Other members of the court would not even attempt that much. To the extent my opinion responds to others, it focuses primarily on the Chief Justice's opinion——not because I disagree with her the most (I don't), but because in moving closer to the constitution, her opinion helpfully illustrates the remaining distance we need to go before we can call ourselves constitutionally orthodox.

### A. What we have done before

¶200 "We cannot rehash original meaning——and its interaction with stare decisis——every time a partial veto comes before us[,]" the Chief Justice says. Chief Justice Roggensack's concurrence/dissent, ¶75. Maybe. But if we were to address ourselves to the original meaning of the relevant constitutional text in this case, we wouldn't be rehashing it, we would be analyzing it for the first time. In our 85 years of experience with the partial veto, we have not once asked how it fits with the origination clause, the amendment clause, or the legislative passage clause.

¶201 Standing between us and the constitution's original meaning, however, is a string of cases stretching back over those 85 years. Stare decisis counsels that we tread carefully here,

21

and that we not upset what has been settled without a good reason. This principle rests on the premise that we do not begin every analysis ab initio mundi; our work builds on the accomplishments of our capable predecessors. If a court disregards this premise, there is a risk that "deciding cases becomes a mere exercise of judicial will, with arbitrary and unpredictable results." State v. Roberson, 2019 WI 102, ¶49, 389 Wis. 2d 190, 935 N.W.2d 813 (quoting Schultz v. Natwick, 2002 WI 125, ¶37, 257 Wis. 2d 19, 653 N.W.2d 266 (citations and quotations omitted)). Embedded within our commitment to stare decisis is our recognition that "reliance interests are real, prior generations of judges did their job with wisdom, and efficiency in dispute resolution is important." Daniel R. Suhr & Kevin LeRoy, The Past and the Present: Stare Decisis in Wisconsin Law, 102 Marq. L. Rev. 839, 859 (2019). It is also conducive to what others legitimately expect of their judicial servants: "Litigants and the public at large need to know courts function as neutral decision makers, delivering equal justice under law." Id. All of this explains why we must be "'respectful of the doctrine of stare decisis.'" Chief Justice Roggensack's concurrence/dissent, ¶66 (quoting Roberson, 389 Wis. 2d 190, ¶49).

¶202 But we mustn't let this principle capture us, for it contains dangers of its own. To err is human, and judges are nothing if not human——especially when the mellifluousness of "your honor" makes the humility necessary to recognize mistakes harder to maintain. See generally Marah Stith McLeod, A Humble Justice, The Yale L.J. Forum (Aug. 2, 2017). And the potential for mistakes is constantly at hand, because it is tempting for a creative court

22

to reach a decision "by extorting from precedents something which they do not contain." Robert Rantoul, Oration in Scituate (July 4, 1836) in Antonin Scalia, A Matter of Interpretation 39 (1991). Once embarked on this path, it is too easy for the court to "extend [its] precedents, which were themselves the extensions of others, till, by this accommodating principle, a whole system of law is built up without the authority or interference of the [people]." Id. In this way, it is possible for us to "'do more damage to the rule of law by obstinately refusing to admit errors, thereby perpetuating injustice, than by overturning an erroneous decision.'" Roberson, 389 Wis. 2d 190, ¶49 (quoting Johnson Controls, Inc. v. Emp'rs Ins. of Wausau, 2003 WI 108, ¶100, 264 Wis. 2d 60, 665 N.W.2d 257).

¶203 We risk this doctrine becoming a mechanism for error-perpetuation if we don't respect its purpose: To remind us that those who came before were diligent and capable in their work, and that in doubtful matters it is best to leave settled things settled unless there is a clear and present need to do otherwise.

> In the matter of reforming things, as distinct from deforming them, there is one plain and simple principle; a principle which will probably be called a paradox. There exists in such a case a certain institution or law; let us say, for the sake of simplicity, a fence or gate erected across a road. The more modern type of reformer goes [happily] up to it and says, "I don't see the use of this; let us clear it away." To which the more intelligent type of reformer will do well to answer: "If you don't see the use of it, I certainly won't let you clear it away. Go away and think. Then, when you can come back and tell me that you do see the use of it, I may allow you to destroy it.

23

G.K. Chesterton, The Thing: Why I am Catholic 27 (Dodd, Mead and Co., Inc. 1930).

¶204 Most of the members of this court would turn this prudential lesson into a permanent fence that would deprive Chesterton's reformer of the ability to bring change even after he had gained the necessary wisdom. To fortify this fence, the Chief Justice turns to Justice Scalia, who once said:

> "In [originalism's] undiluted form, at least, it is medicine that seems too strong to swallow. Thus, almost every originalist would adulterate it with the doctrine stare decisis——so that Marbury v. Madison would stand even if [a prominent legal scholar] should demonstrate unassailably that it got the meaning of the Constitution wrong."

Chief Justice Roggensack's concurrence/dissent, ¶67 (quoting Antonin Scalia, Originalism: The Lesser Evil, 57 U. Cinn. L. Rev. 849, 861 (1989) (alteration in original)). But if the Chief Justice believes Justice Scalia thought stare decisis should unalterably privilege precedent over text, she is mistaken. Both Chesterton and Justice Scalia were both consciously addressing something that could be described as a paradox, and this quote captures only one of its sides. The other is on display in Justice Scalia's many opinions in which he sets the doctrine aside in favor of the text. So, for example, he disregarded precedent when it was "wrong and unworkable," or its rationale had no support in "history, precedent, or common sense." See, e.g., Witte v. United States, 515 U.S. 389, 406 (1995) (Scalia, J., concurring) ("This is one of those areas in which I believe our jurisprudence is not only wrong but unworkable as well, and so persist in my refusal to give that jurisprudence stare decisis

24

effect."); <u>Dickerson v. United States</u>, 530 U.S. 428, 450, 461-65 (2000) (Scalia, J., dissenting) (urging the Court to disregard <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), because its underlying rationale had no support in "history, precedent, or common sense.").[8]

¶205 So when precedent unavoidably collides with the law——that is, when it is wrong and its rationale has no support in history, precedent, or common sense——there must be no doubt about which will prevail. I agree with Justice Clarence Thomas, who said that "[w]hen faced with a demonstrably erroneous precedent, my rule is simple: We should not follow it. This view of <u>stare decisis</u> follows directly from the Constitution's supremacy over other sources of law——including our own precedents." <u>Gamble v. United States</u>, 139 S. Ct. 1960, 1984 (2019) (Thomas, J., concurring). It also follows from the fact that no amount of judicial error can change the constitution, for "[t]he meaning of the constitutional provision having been once firmly established

---

[8] The Chief Justice isn't quite as wed to <u>stare decisis</u> as her opinion would seem to suggest. For an abbreviated sample of cases in which she wrote an opinion overturning one or more precedents, <u>see</u> <u>State v. Roberson</u>, 2019 WI 102, 389 Wis. 2d 190, 935 N.W.2d 813, <u>abrogating</u> <u>State v. Dubose</u>, 2005 WI 126, 285 Wis. 2d 143, 699 N.W.2d 582; <u>Koschkee v. Taylor</u>, 2019 WI 76, ¶1, 387 Wis. 2d 552, 929 N.W.2d 600, <u>overruling</u> <u>Coyne v. Walker</u>, 2016 WI 38, 368 Wis. 2d 444, 879 N.W.2d 520; <u>Megal v. Green Bay Area Visitor & Convention Bureau, Inc.</u>, 2004 WI 98, 274 Wis. 2d 162, 682 N.W.2d 857, <u>abrogating</u> <u>Balas v. St. Sebastian's Congregation</u>, 66 Wis.2d 421, 225 N.W.2d 428 (1975) and <u>Lealiou v. Quatsoe</u>, 15 Wis. 2d 128, 112 N.W.2d 193 (1961); <u>State v. Ferguson</u>, 2009 WI 50, 317 Wis. 2d 586, 767 N.W.2d 187, <u>overruling</u> <u>State v. Mikkelson</u>, 2002 WI App 152, 256 Wis. 2d 132, 647 N.W.2d 421; <u>State v. Sykes</u>, 2005 WI 48, 279 Wis. 2d 742, 695 N.W.2d 277, <u>overruling</u> <u>State v. Hart</u>, 2001 WI App 283, 249 Wis. 2d 329, 639 N.W.2d 213.

25

as of the time of its adoption, such meaning continues forever, unless it is changed or modified by the Constitution." State v. Schinz, 194 Wis. 397, 403, 216 N.W. 509 (1927).

¶206 Justice Thomas's formulation also respects the fact that the judiciary's authority to decide cases is dependent upon an oath in which we swear to uphold the constitution——an oath that makes no reference to our precedents. "[T]he Constitution does not mandate that judicial officers swear to uphold judicial precedents. And the Court has long recognized the supremacy of the Constitution with respect to executive action and 'legislative act[s] repugnant to' it." Gamble, 139 S. Ct. at 1985 (Thomas, J., concurring) (quoted source omitted; second alteration in original)); see also Mayo v. Wis. Injured Patients & Families Comp. Fund, 2018 WI 78, ¶91, 383 Wis. 2d 1, 914 N.W.2d 678 (Rebecca Grassl Bradley, J., concurring) ("'[T]he Constitution is to be considered in court as a paramount law[.]'" (quoting Marbury v. Madison, 5 U.S. (1 Cranch) 137, 178 (1803)). This supreme law is the very source of the authority we exercise. If we used it in a manner repugnant to its source, we would break faith with those who are the stewards of the document from which that authority arises. This we must avoid at all cost, even should it mean abandoning our wrongly decided cases. We have been equal to the task when called upon to do so before, and we must not shrink from it now.

B. Of the provenance and operation of "topicality"

¶207 Today's decision expressly carries forward our partial veto jurisprudence, along with all of its errors, with the

26

unremarkable consequence that, when we finished our work, pieces of the legislative mechanism were still in the wrong place. The Chief Justice says "[h]aving broken no new ground, I employ our decisions and continue the constitutional analysis of 'part' in the four vetoes that were challenged." Chief Justice Roggensack's concurrence/dissent, ¶90.[9] The undisturbed ground on which the Chief Justice builds her analysis is the germaneness test we adopted in Wisconsin Senate:

> [F]or the first time in this case [we] give explicit judicial recognition to[] the long-standing practical and administrative interpretation or modus vivendi between governors and legislatures, that the consequences of any partial veto must be a law that is germane to the topic or subject matter of the vetoed provisions.

Wis. Senate, 144 Wis. 2d at 437. The Chief Justice's statement of the rule is almost identical: "A veto that does not alter legislative control of the topic or subject matter of enrolled bills has been referred to as 'germane.'" Chief Justice Roggensack's concurrence/dissent, ¶91. Whether we call this a "germaneness" test (as we did in Wisconsin Senate) or a "topic or subject matter" test (as the Chief Justice does) it has nothing to do with the constitution, as the Wisconsin Senate quote makes clear. It is, instead, merely descriptive of how the executive and legislative branches have conducted themselves. As I will

---

[9] The "continu[ing] constitutional analysis of 'part[,]'" unfortunately, did not extend beyond reciting the partial veto language and noting that "part" is something less than the whole. Neither the Chief Justice nor Justice Ann Walsh Bradley mention any of the constitutional provisions that must be ignored to operationalize our historical understanding of "part."

27

explain below, while this may helpfully guide us to a starting point for our analysis, it can never authoritatively establish what the judiciary must consider to be constitutionally orthodox. Consequently, our analysis ended where we should have just been starting, which means we are no closer to a constitutional understanding of our subject than we were in Wisconsin Senate. I'll say a brief word about the inadequacy of the topicality test first, and then address why we shouldn't be in the business of blessing the other branches' modi vivendi, as Wisconsin Senate says.

### 1. Why "topicality" is an inadequate rule

¶208 The Chief Justice says a partial veto is appropriate so long as it does "not alter the topic or subject matter of the 'whole' bill before the veto . . . . [S]uch a veto does not alter the stated legislative idea that initiated the enrolled bill." Chief Justice Roggensack's concurrence/dissent, ¶11 (footnote omitted). It then repeats the proposition at greater length, but without any additional explanatory power:

> When the part approved by the governor does not alter the topic or subject matter of the whole bill presented to him for signature, the part approved maintains the legislature's choice of topic or subject matter that underlies the "whole" bill. Stated otherwise, when the legislative topic or subject matter is maintained, the "part" approved and the "part" that was not approved remain portions of the same "whole" bill, consistent with the constitutional text of § 10(1)(b).

Id., ¶91.

¶209 The problem with the topicality rule is that it does nothing to repatriate the law-authoring piece of the legislative mechanism to the legislature. From a constitutional perspective,

28

it really doesn't matter whether the remaining parts of the bill speak to the same topic or subject as the bill passed by the legislature. It matters whether they are <u>different</u> from what the legislature passed. The legislature does not pass a topic on which the governor may riff, it passes one or more proposed laws that he may accept or reject. And, as the Chief Justice's opinion very capably explains, <u>id.</u>, ¶29, we understand that the partial veto power arose in response to the legislature's practice of bundling several proposed laws into one appropriations bill, and that its telos was to give the governor the option of severally treating each of the proposed laws. But a bundle of proposed laws is not an invitation to bebop. The topicality rule may keep the governor's improvisations attached to the neighborhood of the original bill, but it still allows him to change the legislatively proposed law into something on which the legislature never voted. So the topicality test still leaves law-authoring power where it does not belong.

2. Why we cannot accede to the other branches' <u>modus vivendi</u>

¶210 Not only is the topicality rule insufficient to put the pieces of the legislative mechanism back where they belong, the rationale on which it rests is at odds with our responsibility to ensure the branches of government don't barter their powers. Part of the undisturbed ground on which the Chief Justice bases her analysis is the executive and legislative branches' "historical practice," which we said in <u>Wisconsin Senate</u> was a "<u>modus vivendi</u>" that had "achieved the force of law." <u>Wis. Senate</u>, 144 Wis. 2d at 453. But when it comes to the allocation of powers amongst the

29

branches, there is no force of law capable of reallocating them, save only a constitutional amendment.

¶211 I have addressed elsewhere the nature and rough contours of how the constitution allocates power amongst the branches of government, so I won't belabor them here. See, e.g., Wis. Legislature, 391 Wis. 2d 497, ¶92 (Kelly, J., concurring) ("Powers constitutionally vested in the legislature include the powers: "'to declare whether or not there shall be a law; to determine the general purpose or policy to be achieved by the law; [and] to fix the limits within which the law shall operate.'" quoting Schmidt v. Dep't of Res. Dev., 39 Wis. 2d 46, 59, 158 N.W.2d 306 (1968) (alterations in original)); State ex rel. Wisconsin Dev. Auth. v. Dammann, 228 Wis. 147, 159, 277 N.W. 278, on reh'g, 228 Wis. 147, 280 N.W. 698 (1938) ("It is fundamental that under our constitutional system the governmental power to execute the laws is vested in the executive department of the state[.]"); and Gabler v. Crime Victims Rights Bd., 2017 WI 67, ¶37, 376 Wis. 2d 147, 897 N.W.2d 384 ("No aspect of the judicial power is more fundamental than the judiciary's exclusive responsibility to exercise judgment in cases and controversies arising under the law.").

¶212 The piece of the doctrine that bears some emphasis in this case is that the location of the boundaries between the branches is a structural limitation that is beyond the branches' power to move, no matter the length of their practice to the contrary. Even if two coordinate branches of government should agree that the boundary might lie more comfortably elsewhere, they are powerless to affect its actual location. The importance of

30

constitutional limitations, Chief Justice Marshall once said, is that they compel restraint when restraint is not desired: "To what purpose are powers limited, and to what purpose is that limitation committed to writing, if these limits may, at any time, be passed by those intended to be restrained?" Marbury, 5 U.S. (1 Cranch) at 176. This forbids the voluntary transfer of core powers to another branch just as much as it protects one branch from encroachment by another. "It is . . . fundamental and undeniable that no one of the three branches of government can effectively delegate any of the powers which peculiarly and intrinsically belong to that branch." Rules of Court Case, 204 Wis. 501, 503, 236 N.W. 717 (1931); see also id. (stating that "'any attempt to abdicate [a core power] in any particular field, though valid in form, must, necessarily, be held void'" (quoting State ex rel. Mueller v. Thompson, 149 Wis. 488, 491, 137 N.W. 20 (1912))). Even the abandonment of a branch's own authority cannot justify a coordinate branch taking it up and using it as its own. "'As to these areas of authority, . . . any exercise of authority by another branch of government is unconstitutional.'" Gabler, 376 Wis. 2d 147, ¶31 (quoting State ex rel. Fiedler v. Wis. Senate, 155 Wis. 2d 94, 100, 454 N.W.2d 770 (1990) (ellipses in original)).

¶213 The operative principle here is not that the branches should not delegate their core authority, it is that they cannot. This principle is a matter of power, not of prudence: the constitution's progenitors did not grant the various branches permission to shuffle their distinct powers amongst themselves.

31

Justice Neil Gorsuch, commenting on this principle in the federal context, consulted John Locke ("one of the thinkers who most influenced the framers' understanding of the separation of powers") for its animating rationale:

> "The legislative cannot transfer the power of making laws to any other hands; for it being but a delegated power from the people, they who have it cannot pass it over to others. The people alone can appoint the form of the commonwealth, which is by constituting the legislative, and appointing in whose hands that shall be. And when the people have said we will submit to rules, and be governed by laws made by such men, and in such forms, nobody else can say other men shall make laws for them; nor can the people be bound by any laws but such as are enacted by those whom they have chosen and authorised to make laws for them."

Gundy v. United States, 139 S. Ct. 2116, 2133-34 (2019) (Gorsuch, J., dissenting) (quoting John Locke, The Second Treatise of Civil Government and a Letter Concerning Toleration § 41, p. 71 (1947)).

¶214 It is for that reason that the several branches of government cannot alienate their core powers, even if they consciously intend that end. Not because it would be unwise, or imprudent, but because those who created them gave them no power to do so. Therefore, prohibiting the legislature and executive from swapping their powers "isn't about protecting institutional prerogatives or governmental turf." Gundy, 139 S. Ct. at 2135 (Gorsuch, J., dissenting). Instead, "[i]t's about respecting the people's sovereign choice to vest the legislative power in [the legislature] alone. And it's about safeguarding a structure designed to protect their liberties, minority rights, fair notice, and the rule of law." Id. In the constellation of constitutional doctrines, this serves as one of the central organizing principles.

32

Without it, our constitution would be an incomprehensible jumble: "If [the Legislature] could pass off its legislative power to the executive branch, the '[v]esting [c]lauses, and indeed the entire structure of the Constitution,' would 'make no sense.'" Id. at 2134-35 (quoted source omitted; second and third alterations in original).

¶215 But just because the legislative and executive branches shouldn't pass their powers around doesn't mean they won't sometimes try. Indeed, Wisconsin Senate's recognition that the legislative and executive branches have arrived at a "modus vivendi" in the allocation of their powers proves not only that they are willing to try, but that they sometimes succeed. This would not necessarily come as a surprise to the constitution's authors. They structured it to prevent the shifting of boundaries through its internal system of checks and balances, and by arraying ambition against ambition, yet they knew these structures wouldn't be sufficient to prevent all attempted incursions. "The framers knew . . . that the job of keeping the legislative power confined to the legislative branch couldn't be trusted to self-policing by Congress; often enough, legislators will face rational incentives to pass problems to the executive branch." Id. at 2135. When an attempted incursion comes before us, we do not have the luxury of shrugging off our duty to repulse it.

> [T]he Constitution does not permit judges to look the other way; we must call foul when the constitutional lines are crossed. Indeed, the framers afforded us independence from the political branches in large part to encourage exactly this kind of "fortitude . . . to do [our] duty as faithful guardians of the Constitution."

33

Id. (quoting The Federalist No. 78, at 468-469 (C. Rossiter ed. 1961) (ellipsis in original)).

¶216 The Chief Justice may very well be right that the legislative and executive branches have fallen into a comfortable partial veto routine in which the legislature allows the governor to unilaterally create law so long as it's on the same topic as the bill he is reviewing. But basing our analysis on that practice is quite literally the definition of "begging the question." We should not base our analysis on a logical fallacy, especially when the assumed conclusion is one our constitution so thoroughly rejects.[10]

### IV. WHAT WE SHOULD DO

¶217 I propose that we respect the constitution's structural limitations on what it means for a bill to be approved "in part." As I explained above, the law-making mechanism described by our constitution contemplates that the most elemental part of a bill can be no less than an idea——that is to say, a proposal for a

---

[10] The Chief Justice finds this constitutional analysis faulty because it "does not account for the text of the Wisconsin Constitution," and it "ignore[s] that Wisconsinites are free to assign powers traditional to one branch of government to another branch by constitutional amendment." Chief Justice Roggensack's concurrence/dissent, ¶87. Well, the people of Wisconsin certainly are free to reassign the traditional powers of one branch to another. But whether the people did so by making the governor into a one-man legislature requires accounting for all of the constitutional provisions relevant to the legislative process. Might I remind the Chief Justice that her conclusion that the people of Wisconsin did this novel and radical thing is based on a single word? And that her opinion did not even refer to the constitutional provisions that define the legislative process even once? The word "part" simply isn't powerful enough to countermand all the constitutional text necessary to make the Chief Justice's understanding of the partial veto viable.

34

complete, entire, and workable law. This, of course, makes perfect sense in light of the partial veto power's purpose, which the Chief Justice persuasively described as answering the legislative practice of bundling many proposed laws into one bill.[11] Therefore, because the partial veto power cannot act against any division less than the most elemental part, the governor must take the bill as he finds it: as a collection of proposed laws. So the smallest part of a bill against which the partial veto may act is one of the proposed laws in that collection. Consequently, the applicable rule guiding the application of the partial veto is as follows: After exercising the partial veto, the remaining part of the bill must not only be a "complete, entire, and workable law," it must also be a law on which the legislature actually voted; and the part of the bill not approved must be one of the proposed laws in

---

[11] We have understood this as the rationale for the partial veto from the very beginning:

> [T]he Legislature may, if it pleases, unite as many subjects in one bill as it chooses. Therefore, in order to check or prevent the evil consequences of improper joinder, so far, at least, as appropriation bills are concerned, it may well have been deemed necessary, in the interest of good government, to confer upon the Governor, as was done by the amendment in 1930 of section 10, art. 5, Wis. Const., the right to pass independently on every separable piece of legislation in an appropriation bill.

State ex rel. Wis. Tel. Co. v. Henry, 218 Wis. 302, 315, 260 N.W. 486 (1935).

35

the bill's collection.[12]  Nothing less than this will restore the

pieces of the legislative machinery to their proper places.[13]

---

[12] This, of course, is very close to the rule stated in <u>Henry</u>. Indeed, the rule, in the main, simply makes <u>Henry</u>'s unstated assumption explicit in that it requires the remaining parts of the bill to contain ideas on which the legislature actually voted.

[13] Justice Ann Walsh Bradley says we should not return to our constitution's structural limitations on the partial veto because it "embraces a test neither advanced by any party nor ever applied in any case."  Justice Ann Walsh Bradley's concurrence/dissent, ¶113.  I disagree, of course.  But I think a few words on the <u>nature</u> of this objection would be appropriate, starting with the latter clause.  It is an embarrassment, not a source of authority, that our court has never honored the constitution's limitations on the partial veto.  Perpetuating an embarrassment is not a judicial doctrine to which I subscribe.  Nor is the novelty of applying the constitution's terms to this case an argument against doing so. There is a first time for everything that happens——including the "topicality/germaneness" test, which had never been applied in any case in Wisconsin's history until the day it was.  Because everything has its genesis, a proscription against doing something for the first time——if we were to take it seriously——would be a condemnation of everything that has ever been done.  That is not a workable standard.

¶218 Justice Ann Walsh Bradley is concerned that my analysis would collapse our constitution's partial veto into something indistinguishable from other states' line-item vetoes. "[T]here is a difference," she says, "between a 'partial' and an 'item' veto . . . [;] [Justice Kelly's opinion] does not account for the difference and would, as a practical matter, result in an 'item' veto in spite of Wisconsin's unique constitutional language." Justice Ann Walsh Bradley's concurrence/dissent, ¶150. I do not think that is so. There is no mandatory, single definition for what a "line-item veto" might comprise, so its content and

---

But even more interesting to me, because of its curiousness, is the objection that we should not interpret the law in a manner not advanced by one of the parties. That sentiment compasses an understanding of the court that is entirely foreign to me. The work of the judiciary is not some glorified form of "baseball arbitration" in which we are constrained to choosing one of the proposals offered by the competing parties. The attorneys who appear before us are there to help us discover what the law requires, not to control us. It is our job, not theirs, to "say what the law is." Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177 (1803). If we should discover, in the course of our research, that the parties both mistook it for something other than it is, it would be an abdication of our sworn duty to simply adopt whichever argument seemed closest to what the law actually says. Our responsibility is to determine for ourselves——in every single case, without exception——what the law requires. And there is no one to whom we can delegate that responsibility. So even if neither of the parties' arguments were correct, our duty would remain the same——to discover and say what the law says, not what a party says.

Happily, Justice Ann Walsh Bradley's concern about whether I grounded my analysis in a party's argument is unwarranted here. The petitioner's brief and the legislature's amicus brief, in combination, either directly or obliquely advance most of the analysis in my opinion. And if the concern is that part of the analysis appears in an amicus brief rather than a party brief, then I wonder why we allow amici at all.

37

operation could vary from state to state. But generally speaking, line-item vetoes operate only on the fiscal elements of an appropriation bill. Corpus Juris Secundum contains the following description of such a veto:

> The purposes of an appropriations item or line-item veto are to give the executive, who is elected statewide rather than from a particular district, the power to achieve fiscal constraint and to advance statewide rather than parochial fiscal interests by excising unneeded "pork barrel" programs or projects from an appropriations bill so as to restrain public expenditures and to permit the governor to disentangle issues so they will be considered on their individual merits . . . .
>
>  . . . Specific allocations within a general appropriation are subject to separate veto, either leaving the general appropriation intact in its full and original amount or reduced by a sum less than the aggregate of the specific items vetoed.

82 C.J.S. Statutes § 68 (2020) (footnotes omitted).

¶219 Currently, 43 states have some form of the item/partial veto. Most limit the vetoes to the fiscal elements of an appropriation bill. So Wisconsin's partial veto would not be the same as a line-item veto inasmuch as ours could be used as against any of the legislative ideas bundled into an appropriations bill, even if the vetoed part contained no appropriation.

## V. APPLICATION

¶220 2019 Assembly Bill 56 (which became 2019 Wis. Act 9, as amended by the governor's "veto") contained a multitude of proposed laws, amongst which were a school bus modernization fund, a local roads improvement fund, a modified vehicle registration fee schedule, and a tax on vapor products. Here is how a

38

constitutionally-grounded partial veto analysis would address the governor's actions.

<h3 style="text-align:center">A. School Bus Modernization Fund</h3>

¶221 The first partial veto at issue in this case changed a school bus modernization fund into an alternative fuel fund. Section 55c established a grant for the replacement of school buses. And § 9101(2i) identified the monies to be used to fund the replacement program. The governor's partial "veto" amended § 55c as follows:

> 16.047(4s) of the statutes is created to read: 16.047 (4s) ~~SCHOOL BUS REPLACEMENT~~ GRANTS. ~~(a) In this subsection: 1. "School board" has the meaning given in s. 115.001(7).2. "School bus" has the meaning given in s. 121.51(4).(b)~~ The department shall establish a program to award grants of settlement funds from the appropriation under s. 20.855(4)(h) ~~to school boards for the replacement of school buses owned and operated by the school boards with school buses that are energy efficient, including school buses that use alternative fuels. Any school board may apply for a grant under the program. (c) As a condition of receiving a grant under this subsection, the school board shall provide matching funds equal to the amount of the grant award. (d) A school board may use settlement funds awarded under this subsection only for the payment of costs incurred by the school board to replace school buses in accordance with the settlement guidelines.~~

The governor entirely struck § 9101(2i):

> ~~(2i) VOLKSWAGEN SETTLEMENT FUNDS. Of the settlement funds in s. 20.855(4)(h), during the 2019-21 fiscal biennium, the department of administration shall allocate $3,000,000 for grants under s. 16.047 (4s) for the payment of school buses.~~

The surviving language reads: "16.047(4s) of the statutes is created to read: 16.047 (4s) GRANTS. The department shall

establish a program to award grants of settlement funds from the appropriation under s. 20.855(4)(h) for alternative fuels."

¶222 The Chief Justice says the result is not on the same topic as the original bill. But "topicality" is an elastic measuring tape, as even the Chief Justice recognizes. Chief Justice Roggensack's concurrence/dissent, ¶91 ("Clearly, the evaluation of 'part' and 'whole' in § 10(1)(b) depends on how broadly you define the topic or subject matter."). Both before and after the veto, this part of the bill created a grant program. And the funding would still come from the Volkswagen dispute settlement. The Chief Justice says the "topic" of the provision was replacement of buses, not limiting carbon emissions. Actually, it was both. The legislature wanted school boards to replace current school buses not with just any buses, but "with school buses that are energy efficient, including school buses that use alternative fuels." So it seems that under the Chief Justice's "topicality" test, the constitutionality of a partial veto depends on which topic we figure is more important.

¶223 The resolution called for by the constitution is considerably more straightforward. Here, the legislature bundled the creation of a school bus replacement fund into a bill with many other proposed laws. As relevant here, the school bus replacement fund is the proposed law, the legislative idea. The governor could approve that part of the bill or he could reject it. What he may not do is turn it into something other than what passed the legislature. This partial "veto" was inappropriate

40

because it violated the origination clause, the amendment clause, and the legislative passage clause.

### B. The Local Road Improvement Fund

¶224 In another part of 2019 Assembly Bill 56, the legislature proposed the creation of a local road improvement fund. The governor amended the proposed law by using his partial "veto" on §§ 126, 184s, and 1085m:

- Section 126: "(fc) Local ~~roads improvement discretionary~~ supplement . . . ~~90,000,000~~ [the governor replaced it with 75,000,000]."

- Section 184s: "20.395(2)(fc) of the statutes is created to read: 20.395(2) (fc) Local ~~roads improvement discretionary~~ supplement. From the general fund, as a continuing appropriation, the amounts in the schedule for ~~the~~ local ~~roads improvement discretionary supplemental~~ grant ~~program under s. 86.31 (3s)~~."

- Section 1085m: ~~"86.31 (3s) of the statutes is created to read: 86.31 (3s) DISCRETIONARY SUPPLEMENT GRANTS. (a) Funds provided under s. 20.395 (2) (fc) shall be distributed under this subsection as discretionary grants to reimburse political subdivisions for improvements. The department shall solicit and provide discretionary grants under this subsection until all funds appropriated under s. 20.395 (2) (fc) have been expended. (b) 1. From the appropriation under s. 20.395 (2) (fc), the department shall allocate $32,003,200 in fiscal year 2019-20, to fund county truck highway improvements. 2. From the appropriation under s. 20.395 (2) (fc), the department shall allocate $35,149,400 in fiscal year 2019-20, to fund town road improvements. 3. From the appropriation under s. 20.395 (2) (fc), the department shall allocate $22,847,000 in fiscal year 2019-20, to fund municipal street improvement projects. (c) Notwithstanding sub. (4), a political subdivision may apply to the department under this subsection for reimbursement of not more than 90 percent of eligible costs of an improvement."~~

41

The surviving language reads: "20.395(2)(fc) of the statutes is created to read: 20.395(2) (fc) Local supplement. From the general fund, as a continuing appropriation, the amounts in the schedule for local grant."

¶225 These, of course, were amendments just as much as the partial "veto" of the school bus modernization fund was an amendment, not a veto. The result of these amendments is that the new idea introduced by the amendment passed into law without the legislature ever voting for it. This "veto" was inappropriate for the same reasons the partial "veto" of the school bus modernization fund was inappropriate.

C. Vehicle Fee Schedule

¶226 Section 1988b of the bill would have made the registration fee for four truck weight classes identical. The governor amended this section with his partial "veto" as follows:

> 341.25(2) ~~(a) to (cm)~~ of the statutes are amended to read: 341.25 (2)(a) Not more than 4,500 $ 75.00 100.00 (b) Not more than 6,000 . . . . . . . . . . 84.00 100.00 ~~(c) Not more than 8,000 . . . . . . . . . . 106.00 100.00 (cm) Not more than 10,000 . . . . . . . . . . 155.00 100.00~~

Prior to the "veto," all registration fees were $100, but what remained afterwards was a graduated schedule according to vehicle size. This might be good policy, but it's not a veto. It's an amendment, and it fails for the same reason as the others.

D. Vapor Products Tax

¶227 Section 1754 addresses taxation of vapor products. The governor amended it with his partial "veto" as follows:

> 139.75 (14) of the statutes is created to read: 139.75 (14) "Vapor product" means a noncombustible product that produces vapor or aerosol for inhalation from the

42

application of a heating element ~~to a liquid or other substance that is depleted as the product is used,~~ regardless of whether the liquid or other substance contains nicotine.

The surviving language reads: "139.75 (14) of the statutes is created to read: 139.75 (14) 'Vapor product' means a noncombustible product that produces vapor or aerosol for inhalation from the application of a heating element regardless of whether the liquid or other substance contains nicotine."

¶228 In this part of the bill, the legislature proposed a law that would tax "vaping" equipment, but not the liquids used in the equipment. The governor's partial "veto" expanded the tax to include the liquids as well, which made it an amendment, not a veto. For anyone even vaguely familiar with our country's history and the revolution that brought it into existence, this should make you sit up and take notice: The governor, all by himself, imposed a tax on a product without legislative approval. Taxation without representation was once a powerful rallying cry. See Declaration of Independence (U.S. 1776) (One of our grievances with the King of England was his habit of "imposing taxes on us without our consent[.]"; John Dickinson, Letter's From a Farmer in Pennsylvania reprinted in Tracts of the American Revolution 141 (1763-1776) (Merrill Jensen ed., Hackett Pub. Co. 2003) (1768) ("That it is inseparably essential to the freedom of a people, and the undoubted right of Englishmen, that NO TAX be imposed on them, but with their own consent, given personally, or by their representatives."). As with all the other partial "vetoes" in this case, this one violated the origination clause, the amendment clause, and the legislative passage clause. It also violated the

43

unwritten, but only slightly less well-known, "don't do revolution-inciting things" clause.

## VI. CONCLUSION

¶229 Because a majority of this court does not favor this analysis, our partial veto jurisprudence leaves key pieces of the legislative machinery in places where they do not belong. As a direct and unavoidable result, our cases (including this one) condone violations of the origination clause, the amendment clause, and the legislative passage clause.

¶230 The proper role of the partial veto is to separate the several proposed laws the legislature bundled into one appropriations bill. After exercising this veto power, the remaining document must comprise one or more "complete, entire, and workable laws," all of which must have passed the legislature. The corollary to this is that the part or parts of the bill the governor did not approve must also comprise one or more "complete, entire, and workable laws" that had passed the legislature. This symmetry guarantees that the partial veto does nothing but unbundle the proposed laws the legislature had bundled.[14] Because the

---

[14] I would overrule State ex rel. Sundby v. Adamany, 71 Wis. 2d 118, 237 N.W.2d 910 (1976); State ex rel. Kleczka v. Conta, 82 Wis. 2d 679, 264 N.W.2d 539 (1978); Citizens Util. Bd. v. Klauser, 194 Wis. 2d 484, 534 N.W.2d 608 (1995); Risser v. Klauser, 207 Wis. 2d 176, 558 N.W.2d 108 (1997); and State ex rel. Wisconsin Senate v. Thompson, 144 Wis. 2d 429, N.W.2d 385 (1988). Each of these decisions depends on the unconstitutional transfer of law-making power to the governor through the use of a partial veto.

majority of this court does not accurately apply the legislative mechanism the constitution created, I cannot join it. However, I concur with that part of the court's judgment that strikes two of the vetoes at issue in this case, and respectfully dissent from the court's judgment upholding the other two.

¶231 I am authorized to state that Justice REBECCA GRASSL BRADLEY joins this opinion.

---

I would not, however, overrule State ex rel. Wisconsin Tel. Co. v. Henry, 218 Wis. 302, 260 N.W. 486 (1935). Instead, I would modify its holding to make its assumption explicit: The parts of the bill remaining after exercise of the partial veto must comprise "a complete, entire, and workable law" that was actually voted on by the legislature.

2

¶232 BRIAN HAGEDORN, J. (concurring). In 1930, the people of Wisconsin amended our constitution and gave the governor power to veto parts of appropriation bills. Nonetheless, the constitution retains the basic structural principle that legislating is the job of the legislature. The question in this case is whether the judiciary will sanction the former swallowing the latter.

¶233 The partial veto power grants the governor the authority to disapprove appropriations bills in part——a power that no doubt allows the governor to alter the legislature's global policy objectives. The partial veto power in this sense is quasi-legislative in nature. But a bill presented to the governor is not sand on a seashore from which a governor can construct any sandcastle his ingenuity conceives. A bill is not merely a collection of words, letters, and numbers that can be repurposed; it is a set of legislatively chosen policies. A partial veto is the power to negate some proposed policies and accept others, not the power to unilaterally create new policies never passed by the legislature.

¶234 While the governor's partial veto power is incredibly broad, it should not be read to fundamentally upend the overall structure of our government embedded in our constitution. The constitution's placement of law-creation in the hands of the legislature means we cannot permit a practice that turns the governor into a one-person legislature. Because the constitution

1

contains these substantive limitations, we should enforce them, even acknowledging the potential difficulty of that project.

¶235 In this case, the petitioners challenge four sets of vetoes in the state's 2019-21 biennial budget bill.  I conclude that with three of the challenges——the school bus modernization fund, the local road improvement fund, and the vapor products tax——the governor's vetoes went beyond negating legislative policy proposals; they created brand new ones.  These are in excess of the governor's constitutional veto authority.  The fourth challenge to the vehicle fee schedule vetoes was properly within constitutional boundaries.  Therefore, I respectfully concur.

## I.  LEGAL PRINCIPLES

¶236 Something is amiss in our jurisprudence when a constitutional provision allowing the governor to strike parts of an appropriation bill has, through creativity and judicial acquiescence, turned into a license for an enterprising governor to create brand new policies from a proposed package of statutory words.  This is a bipartisan affair, of course, as governors for decades have been working within the Wild West framework this court has established.  But no one conducting a reasonable reading of the partial veto provision in its greater constitutional context would see it as a fundamental reshaping of our constitutional order.  See Justice Kelly's concurrence/dissent, ¶198.  We are here because this court has allowed it to be so.  As one former justice aptly prophesied, "I fear that the court may now have painted itself into a corner, and that a time may come when we

2

regret having done so." State ex rel. Kleczka v. Conta, 82 Wis. 2d 679, 724, 264 N.W.2d 539 (1978) (Hansen, J., dissenting). For me, that time is now.

¶237 So where do we go from here? The petitioners candidly ask us to start from scratch. They ask us to overturn or modify language in every case that we've ever decided on this significant and repeatedly litigated provision. That's a big ask. But the petitioners come with the right question: What is the original public meaning of the constitutional text? Our starting point in constitutional interpretation must be the original public meaning of the constitution's language because this is the law the people have enacted. Attorney Gen. ex rel. Bashford v. Barstow, 4 Wis. *567, *757–58 (1855) (explaining that because the people "made this constitution, and adopted it as their primary law," constitutional interpretation rests not in generic theories of governance, but on the "true intent and meaning" of the "authoritative and mandatory" words of the document itself). But our analysis is informed by, and gives proper deference to, the reasoned decisions of those who have come before us.


    A. Lawmaking in the Wisconsin Constitution

¶238 Three types of government power are described in the Wisconsin Constitution, and each power is vested in a corresponding branch of government. Gabler v. Crime Victims Rights Bd., 2017 WI 67, ¶11, 376 Wis. 2d 147, 897 N.W.2d 384. The senate and assembly are vested with the power to legislate, the governor is vested with the power to execute the laws, and the judiciary is

3

vested with the power to decide cases based on the law. Wis. Const. art. IV, § 1; id. art. V, § 1; id. art. VII, § 2.

¶239 The mechanism for exercising legislative power under the constitution is the enactment of laws; the legislature is the chief lawmaker. League of Women Voters of Wis. v. Evers, 2019 WI 75, ¶35, 387 Wis. 2d 511, 929 N.W.2d 209; Justice Kelly's concurrence/dissent, ¶175. A law begins with a proposed bill, which can originate in either house of the legislature. Wis. Const. art. IV, § 17(2), § 19; Justice Kelly's concurrence/dissent, ¶176. Bills may be amended during this process, and when a bill is passed by both houses of the legislature, it is presented to the governor. Wis. Const. art. IV, § 19; id. art. V, § 10(1)(a); Justice Kelly's concurrence/dissent, ¶¶176-77. The governor then has four potential options: (1) sign the whole bill into law; (2) do nothing and allow the bill to become law on its own after six days (Sundays excluded); (3) veto the whole bill; or (4) if the bill contains an appropriation, sign the bill into law while vetoing part of it.[1] Wis. Const. art. V, § 10(1)(b), § 10(2)(a), § 10(3).

¶240 The fourth option, the partial veto, was added to the constitution in 1930. The relevant constitutional language today provides: "If the governor approves and signs the bill, the bill shall become law. Appropriation bills may be approved in whole or in part by the governor, and the part approved shall become law."

---

[1] If rejected in whole or in part, the bill is returned, with objections, to the originating house, and that which was rejected may nevertheless become law if it garners approval of two-thirds of the members of both houses. Wis. Const. art. V, § 10(2).

4

Id. art. V, § 10(1)(b).[2]  Appropriation bills are required to pay money out of the treasury.  Id. art. VIII, § 2 ("No money shall be paid out of the treasury except in pursuance of an appropriation by law.").

¶241 This framework deserves a few reflections.  First, the constitutional meaning of a "bill" must be rooted in the concept of what the legislature is producing when a bill is passed.  A bill presented to the governor is not a potpourri of words, letters, and numbers that the governor may do with as he wishes.  See State ex rel. Wis. Senate v. Thompson, 144 Wis. 2d 429, 473, 424 N.W.2d 385 (1988) (Bablitch, J., dissenting).  As Justice Kelly explains, a bill is composed of policy proposals (or as Justice Kelly calls them, ideas).  See Justice Kelly's concurrence/dissent, ¶¶175-76, 180.  It is the legislature's province to exercise the legislative power to determine and declare what the policies of the state shall be.  Wis. Const. art. IV, § 1.  And this is done by passing bills composed of its policy choices.  Borgnis v. Falk Co., 147 Wis. 327, 351, 133 N.W. 209 (1911) ("When acting within constitutional limitations, the Legislature settles and declares the public policy of a state . . . .").

¶242 Second, the veto power is a bit of an aberration from the general distribution of constitutional power.  That is, the

_____

[2] The amendment as initially adopted provided:  "Appropriation bills may be approved in whole or in part by the governor, and the part approved shall become law, and the part objected to shall be returned in the same manner as provided for other bills."  1927 S.J. Res. 35.

power to veto, whether in whole or in part, is legislative in nature; it is a participation in lawmaking. Edwards v. United States, 286 U.S. 482, 490-91 (1932) (characterizing the President's ability to approve or disapprove bills as "legislative" in character); Rateree v. Rockett, 852 F.2d 946, 951 (7th Cir. 1988) ("[T]he President acts legislatively when he approves or vetoes bills passed by Congress."); Chief Justice Roggensack's concurrence/dissent, ¶84. And while a partial veto places more quasi-legislative power in the hands of the governor than a whole-bill veto, we cannot lose sight of the nature of a veto. A veto is, by definition, the ability to negate, not create. This is the plain meaning of the word "veto." Veto, Black's Law Dictionary (11th ed. 2019) ("A power of one governmental branch to prohibit an action by another branch." (emphasis added)); The Federalist No. 73 (Hamilton) (describing the veto as "the qualified negative of the President upon the acts or resolutions of the two houses of the legislature").

¶243 Finally, the partial veto power must be read in the context of the whole constitutional structure and design. Namely, any policy proposal that becomes law must be a policy proposed by the legislature——one that originates as a bill that eventually passes both houses of the legislature. Wis. Const. art. IV, § 17(2), § 19; id. art. V, § 10(1)(a). Partial veto or not, the legislature is still the constitutional branch charged with making law, not the governor. See Justice Kelly's concurrence/dissent, ¶175.

6

¶244 We must hold all of these lessons from the constitution together. A blind focus on the partial veto power alone at the expense of the rest of constitutional text is not constitutional faithfulness. State v. City of Oak Creek, 2000 WI 9, ¶18, 232 Wis. 2d 612, 605 N.W.2d 526 (we discern the meaning of the constitutional text based on the context in which it is used). This means any reading of the partial veto power that enables the governor to take the raw materials of a bill (words, letters, and numbers) and recast them to create a new policy not proposed and passed by the legislature contradicts the constitutional design for how a bill becomes a law. And the core negating, not creating, concept of a veto must be true if the legislature is still the branch authorized by the constitution to make law and appropriate funds. Wis. Const. art. IV, § 1, § 17(2), § 19; id. art. VIII, § 2. The legislature must be the primary policymaker, and the governor cannot usurp that role by creating new policies from the reworked language of enacted bills.

¶245 With this broader constitutional framework in view, we turn to a brief overview of how this court has previously handled the partial veto power in particular.

B. The Partial Veto and the Wisconsin Supreme Court

¶246 Alfred North Whitehead famously said that Western philosophy consists of a series of footnotes to Plato.[3] In the same way, this court's decisions interpreting the governor's

---

[3] Alfred North Whitehead, Process and Reality 39 (The Free Press 1978) (1929).

7

partial veto power consist largely of a series of footnotes to our first case on that matter, State ex rel. Wisconsin Telephone Co. v. Henry, 218 Wis. 302, 260 N.W. 486 (1935). Handed down just five years after the ratification of the 1930 amendment, Henry presented two questions: whether the governor could "disapprove parts of an appropriation bill that are not an appropriation" and whether he could "disapprove a proviso or condition inseparably connected to the appropriation." Id. at 309. The court engaged in a considered plain meaning examination of the text and reached several conclusions that establish the framework for the partial veto power.

¶247 Of primary importance, the court reasoned that the choice of constitutional language——using "part" and not "item"—— was intentional and must be given meaning. Id. at 313-14.[4] The amendment, the court concluded, was not an item veto, but a part veto that authorized gubernatorial disapproval of something less than an entire legislative policy proposal. Id. A governor, then, could veto non-appropriation language in appropriation bills. Id. He could also strike portions of a broader policy proposal that did not constitute provisos or conditions inseparably connected to the appropriation. Id. As long as what remained was a complete, entire, and workable law, vetoing portions of the proposed law

---

[4] The court in Henry surveyed constitutions of other states that permitted some form of partial veto. State ex rel. Wis. Tel. Co. v. Henry, 218 Wis. 302, 310-15, 260 N.W. 486 (1935). Noting that many states used "items" or "any item or items or part or parts," the court concluded that our constitution's use of the word "part" but not the word "item" was significant and must be given meaning. Id. at 310-11.

that were not "essential, integral, and interdependent parts of those which were approved" was consistent with the constitution. Id. at 314, 317. Applying this to the facts before it, the court concluded that the vetoed language declaring the purpose for a new appropriation and the proposed creation of a new administrative apparatus for distribution of that appropriation were not provisos or conditions inseparably connected to the remainder. Id. at 317. The governor's veto was therefore within his constitutional authority. Id.

¶248 From this, we observe that Henry identified both procedural and substantive limitations on the partial veto power. Procedurally, what is left must be a complete, entire, and workable law. Id. at 314. This is obviously correct if the part approved is actually to become law as the constitution specifies. Wis. Const. art. V, § 10(1)(b). But the court also recognized substantive limitations, unsubtly suggesting that provisos and conditions that could not be separated from a policy proposal could not be stricken. Henry, 218 Wis. 2d at 309-10. The court labelled the veto power coextensive with the legislature's power to assemble. Id. at 315. But this is just as much a limitation on the power's reach as it is a recognition of the power's breadth. Id. at 315. The court also discussed how severability principles——which include at least some focus on legislative intent——were relevant to an inquiry into the scope of the partial veto power. Id. at 314-15.

¶249 The petitioners ask us to overturn Henry. They argue this court misconstrued the original public meaning from the

9

beginning, and that the partial veto was intended to be an item veto. Some evidence, including newspaper stories reflecting the sponsor's goals and other public discussion on the proposed 1930 amendment, certainly supports this view. But plenty of evidence goes the other way too. See Chief Justice Roggensack's concurrence/dissent, ¶¶31-36 (summarizing the evidence which supports both an item veto and a part veto). Notably, one draft amendment in 1925 would have permitted the governor to disapprove "items or parts of items."[5] This shows the legislature understood the difference between "part" and "item," and that the choice to use this language is reasonably read to mean something. And it is not insignificant that Henry, a decision close in time to the enactment of the amendment, unanimously rejected the petitioners' view. I accept Henry as a fair, considered, and likely correct effort to discern the original public meaning of our constitutional text. At the very least, the petitioners have not demonstrated that the original public meaning is clearly otherwise.

¶250 For the first 45 years of the partial veto power's history, the principles announced in Henry, including a recognition that the broader constitutional context requires both procedural and substantive limitations, remained substantially in place. Our veto cases that abided by these principles are, in my view, unproblematic and consistent with the constitution's meaning. See State ex rel. Finnegan v. Dammann, 220 Wis. 143, 264

---

[5] See 1925 S.J. Res. 23 (proposing to amend Article V, Section 10 to allow the governor to "disapprove or reduce items or parts of items in any bill appropriating money").

10

N.W. 622 (1936); State ex rel. Martin v. Zimmerman, 233 Wis. 442, 289 N.W. 662 (1940).

¶251 The broadly accepted legal framework, however, started to drift in the 1970s. Around that time, governors began to take their partial veto power to new artistic heights.[6] Rather than maintain the twin pillars of both procedural and substantive limitations on that power, this court started to jettison its commitment to any standard other than the requirement that after a partial veto the part approved must be a complete, entire, and workable law.

¶252 This change was explicitly undertaken in Kleczka, 82 Wis. 2d 679. There, the legislature had proposed allowing a taxpayer to effectively increase her tax liability such that $1 would be deposited into the Wisconsin Election Campaign Fund. Id. at 685. As partially vetoed by the governor, the published law enabled the taxpayer to designate that the campaign fund was to receive $1 from the state's general funds. Id. We upheld the veto, and expressly dispensed with Henry's discussion of inseparable provisos or conditions. Id. at 711-15. By sanctioning this action, we allowed the governor to take a policy proposal from the legislature, edit the words, and create a different policy that had not been proposed by the legislature.

---

[6] Among other novelties, governors started removing words such as "not" from sentences to reverse the policy enacted by the legislature (i.e., an "editing veto"). See Richard A. Champagne, Legislative Reference Bureau, The Wisconsin Governor's Partial Veto, at 14-15 (2019).

¶253 Justice Hansen vigorously dissented on the grounds that abandoning any substantive limitations on the partial veto authority could not possibly be consistent with the constitutional design. "It appears," Justice Hansen observed, "that we have now arrived at a stage where one person can design his own legislation from the appropriation bills submitted to him after they have been approved by the majority of the legislature." Id. at 727 (Hansen, J., dissenting). Indeed. As Justice Hansen explained:

> Only the limitations on one's imagination fix the outer limits of the exercise of the partial veto power by incision or deletion by a creative person. At some point this creative negative constitutes the enacting of legislation by one person, and at precisely that point the governor invades the exclusive power of the legislature to make laws.

Id. at 720.

¶254 Justice Hansen's prescience did not stop this court from proceeding further down this path, but we have continued to wrestle with the implications of our jurisprudence. In Wisconsin Senate, while upholding the most creative uses yet of the partial veto power, we recognized as having obtained the "force of law" the notion that vetoes cannot change a policy proposal's topic or subject matter into something unrelated. 144 Wis. 2d at 452-53. This "germaneness" limitation was a clear attempt to acknowledge that the constitution must countenance some kind of substantive limitation of the governor's partial veto power. Id. While we have since reaffirmed the germaneness requirement, this court has never fleshed out what it means or how it operates in practice. See Citizens Util. Bd. v. Klauser, 194 Wis. 2d 484, 505, 534

12

N.W.2d 608 (1995); <u>Risser v. Klauser</u>, 207 Wis. 2d 176, 183, 558 N.W.2d 108 (1997).

¶255 Finally, it is worth noting that in direct response to gubernatorial practice and the outer reaches of our later decisions, the people have twice amended the partial veto power to prevent the governor from using a partial veto to combine sentences or strike letters to make new words. Wis. Const. art. V, § 10(1)(c).[7] These amendments should be given substantive effect, but they should not be read as green-lighting everything less than the limitations they impose. While the amendments represent the people's effort to rein in certain excesses, these constitutionally prescribed procedural limitations aren't particularly instructive regarding whether the constitution still contains other substantive limitations on the partial veto power.

## C. Implementing Doctrine

¶256 The core question presented in this case is whether and how this court will enforce substantive limitations on the scope of the governor's partial veto power moving forward. As reflected in the multiplicity of writings in today's decision and in the tests put forward by the litigants, it is not always easy to discern the line between negating some proposed policies in a bill

---

[7] "In approving an appropriation bill in part, the governor may not create a new word by rejecting individual letters in the words of the enrolled bill, and may not create a new sentence by combining parts of 2 or more sentences of the enrolled bill." Wis. Const. art. V, § 10(1)(c).

and a veto that strategically edits statutory language to create a policy that was not in the legislatively passed bill.

¶257 One response to this dilemma could be to declare that line-drawing is too difficult and to surrender that project altogether. Our more recent cases have trended in this direction, enforcing only procedural limitations and offering at best a tip-of-the-cap to future enforcement of substantive limitations. In effect, this leaves the policing of substantive limitations to politics rather than constitutional law. Such an approach is not without merit. Not all constitutional questions need a judicial referee. We must acknowledge that increased judicial patrolling of these constitutional borderlands is fraught with some danger.[8] Engaging in this line-drawing may lead to uncertainty for political actors and entangle the judiciary in more political and policy fights. And sometimes we make things worse, not better, when we attempt to make distinctions that are——let's be honest here—— awfully hard to delineate with precision from the constitutional text.

¶258 That said, giving up on judicial enforcement of constitutional limits poses greater dangers, especially in an area so central to our constitutional design for how law is made. We swear an oath to uphold the constitution, and it is incumbent on

---

[8] See, e.g., State ex rel. Friedrich v. Circuit Court for Dane Cty., 192 Wis. 2d 1, 14, 531 N.W.2d 32 (1995) (per curiam) ("In these borderlands it is neither possible nor practical to categorize governmental action as exclusively legislative, executive or judicial.").

14

us to defend the separation of powers, even if it involves getting a little dirt under our nails.

¶259 If we are to retain judicially enforceable substantive limitations on the partial veto power, there remains the difficult task of identifying an implementing doctrine, or legal test,[9] that gets us to the heart of the constitution's meaning. Several options are presented in this case.

¶260 The petitioners propose a standard severability test. Under this test, the inquiry is whether the legislature intended for provisions to be severable. Burlington N., Inc. v. City of Superior, 131 Wis. 2d 564, 580, 388 N.W.2d 916 (1986). Essentially, we'd have to determine whether the legislature would still have wanted the provisions as vetoed to become law. This has the virtue of being grounded in some of the discussion in Henry, and theoretically works within existing judicial competence. But it seems difficult, if not impossible, to determine the legislature's intent and preferences when reviewing discrete proposals in omnibus bills reflecting the whole of state government operations. This test also depends on the petitioners'

---

[9] See Ezell v. City of Chicago, 651 F.3d 684, 700-04 (7th Cir. 2011) (devising an implementing doctrine for Second Amendment litigation based on the Supreme Court's original public meaning interpretation of that constitutional provision in District of Columbia v. Heller, 554 U.S. 570 (2008)). See generally Lawrence B. Solum, The Interpretation-Construction Distinction, 27 Const. Comment. 95 (2010) (explaining how authoritative legal texts are applied in two stages: one, the text is interpreted to discern its linguistic meaning and semantic context, and two, the text is given legal effect by translating that meaning and context into implementable legal doctrine).

15

request that we overrule Henry, which I do not believe is warranted.

¶261 The legislature proposes a separate test based on Justice Hansen's dissent in Kleczka: the part rejected, as well as the part remaining, must be a complete, entire, and workable law on its own. Kleczka, 82 Wis. 2d at 726 (Hansen, J., dissenting). The petitioners also support this as an acceptable approach. This test has the virtue of being an objective inquiry that does not entangle the judiciary in subjectively evaluating policy proposals. But as the Chief Justice points out, there is no basis in the constitutional text to suggest that the rejected part must stand on its own as though it were itself enacted law. See Chief Justice Roggensack's concurrence/dissent, ¶89. Justice Hansen's test is at best an indirect way of getting at the core constitutional line of demarcation: allowing the governor to create something the legislature has not proposed, rather than just approve or veto separable proposals. In addition, the legislature's proposal appears to be a backdoor way to turn the part veto into an item veto, or very close to it. And this too does not square with the proposition announced in Henry that the constitutional text allows governors to strike portions of proposals smaller than an item.

¶262 The Chief Justice adopts and attempts to breathe life into the germaneness requirement discussed in Wisconsin Senate. See Chief Justice Roggensack's concurrence/dissent, ¶¶91-94. This test has the virtue of being grounded in our precedent. Moreover, the Wisconsin Senate court adopted the germaneness requirement,

16

which focuses on the topic or subject matter of a provision, as a nod to the need for some substantive limitation on unadulterated gubernatorial creation of legislation. See Wis. Senate, 144 Wis. 2d at 451-52. But this standard suffers from some flaws as well. As to its foundation, the germaneness requirement has not been firmly rooted in the constitutional text, but instead in the historical practice of the legislative and executive branches. Id. at 437, 452-53. Second, while cited, none of our cases have done much to explain what this requirement actually means or how it would guide legal analysis going forward. See Citizens Util. Bd., 194 Wis. 2d at 505; Risser, 207 Wis. 2d at 183. Finally, it does not seem to get to the core issue of policy creation by the governor. It is far too underinclusive. A topicality approach would presumably let the governor rewrite laws to create new policy based on the same topic as the legislature's proposal, thereby allowing the governor to usurp the role of the legislature in violation of the structural separation of powers. In other words, as an implementing doctrine, it does not do well in doing what any good legal test should do: allowing the original public meaning of the constitutional text to come to life when applied to a new set of facts.

¶263 Justice Kelly proposes yet another way. His writing does an excellent job outlining the separation-of-powers problems with our current approach. Justice Kelly frames his proposed legal test as whether the legislature voted on the policy proposal. At a high level, I agree the question is whether the governor vetoed a policy the legislature proposed and passed, which is permissible,

17

or created a new policy the legislature did not propose or pass, which is not. But in application, Justice Kelly's opinion would appear to require sweeping away much if not all of our cases, including Henry. I do not believe the constitutional standard we agree upon requires going this far. I accept Henry's holding that something less than a separate item may be vetoed, and this will necessarily involve some modification of the legislature's policy choice. So while I agree with Justice Kelly on the core constitutional limits, I do not agree with his application of that standard.

¶264 While future litigation will surely provide opportunities to refine the analysis, the principles derived from our constitutional text, structure, and early cases draw sufficient lines to decide this case. The partial veto power is broad and expansive. When presented with an appropriation bill containing various legislative proposals, the governor can——as a general matter——negate some proposals and accept others. This will necessarily effect a partial change in the policy soup reflected in the proposed bill. But what the governor may not do is selectively edit parts of a bill to create a new policy that was not proposed by the legislature. He may negate separable proposals actually made, but he may not create new proposals not presented in the bill.

¶265 By way of a hypothetical, imagine the legislature proposes that $500,000 be appropriated for the building of a house, which may be painted white or blue or brown. Under the principles derived from the constitutional text and our early cases, the

18

governor could strike the word "brown" so that the house may only be white or blue. But the governor could not strike words to create a law that simply appropriates $500,000 to the general fund.[10] While some policy modification is inherent in striking parts of a proposal, a governor may not usurp the legislature's lawmaking role by creating a policy proposal that was not previously there.

¶266 Putting this together, I conclude that the petitioners' request that we overturn Henry and our early cases should be rejected based on the arguments presented in this case. But I agree that later cases must be revisited insofar as they abandoned the core principles undergirding the way laws are made pursuant to our constitution.[11] Rather than simply approving or disapproving of proposed policies, the governor's partial veto power cannot be converted into a tool for wholesale policy creation. By turning the governor into a one-person legislature subject only to a two-thirds override vote, our basic constitutional structure is turned on its head.

---

[10] As discussed further below, this type of gubernatorial creation is similar to the local road improvement fund vetoes, which were an effective rewriting of specific provisions to create a generic appropriation for an undefined local grant.

[11] Accordingly, I agree with petitioners that State ex rel. Kleczka v. Conta, 82 Wis. 2d 679, 264 N.W.2d 539 (1978) is "unsound in principle" and must be overruled. Johnson Controls, Inc. v. Emp'rs Ins. of Wausau, 2003 WI 108, ¶99, 264 Wis. 2d 60, 665 N.W.2d 257. Insofar as our later decisions have treated Kleczka as pronouncing that a veto shall stand simply if it leaves a complete, entire, and workable law, these statements too must be withdrawn.

II. APPLICATION

¶267 Applying those principles to this case, three of the four sets of partial vetoes challenged by the petitioners go beyond what the constitution permits.

¶268 We begin with the sole veto challenge that survives in light of our constitutional framework. In 2019 Wis. Act 9, § 1988b, the legislature sought to amend the registration fees assessed to truck owners based on vehicle weight. The preexisting fees for vehicles weighing not more than 4,500 pounds, 6,000 pounds, 8,000 pounds, and 10,000 pounds respectively were $75, $84, $106, and $155. § 1988b. The legislature proposed modifications to make each of them $100. Id. The governor accepted the increased fee for the lighter weight classifications, but rejected the reduction of the fee for the heavier vehicles. Id. This rejection of the proposed decreases in two registration fees may not reflect the uniform schedule the legislature was apparently intending. But the governor here chose a partially uniform fee schedule by accepting part of the proposed fee schedule and rejecting part of the new fee schedule. These partial vetoes served to negate parts of the broader policy proposal. In rejecting this proposal in part, the governor did not cobble together words or phrases to create a new policy or fee. Rather, he declined to adopt part of a policy change advanced by the legislature. See Wis. Stat. § 341.25(2)(a)-(cm) (2017-18).[12]

_____

[12] All subsequent references to the Wisconsin Statutes are to the 2017-18 version.

20

¶269 The other three sets of partial vetoes, however, cannot be upheld. All three exceed the governor's constitutional power to partially veto appropriation bills.

¶270 First, faced with an appropriation for the replacement of school buses, the governor used multiple vetoes to create an appropriation for alternative fuels. Wisconsin is a beneficiary of the Environmental Mitigation Trust created by a partial consent decree in In re Volkswagen, 2016 WL 6442227 (N.D. Cal. 2016). In Act 9, the legislature enacted two provisions to address the allocation of these funds, §§ 55c and 9101(2i). The governor partially vetoed § 55c as follows:

16.047(4s) of the statutes is created to read:

16.047(4s) ~~SCHOOL BUS REPLACEMENT~~ GRANTS. ~~(a) In this subsection:~~

~~1. "School board" has the meaning given in s. 115.001 (7).~~

~~2. "School bus" has the meaning given in s. 121.51 (4).~~

~~(b)~~ The department [of administration] shall establish a program to award grants of settlement funds from the appropriation under [Wis. Stat. §] 20.855(4)(h) ~~to school boards~~ for ~~the replacement of school buses owned and operated by the school boards with school buses that are energy efficient, including school buses that use~~ alternative fuels. ~~Any school board may apply for a grant under the program.~~

~~(c) As a condition of receiving a grant under this subsection, the school board shall provide matching funds equal to the amount of the grant award.~~

~~(d) A school board may use settlement funds awarded under this subsection only for the payment of costs incurred by the school board to replace school buses in accordance with the settlement guidelines.~~

21

2019 Wis. Act 9, § 55c. Removing the vetoed words, Wis. Stat. § 16.047(4s) now reads: "The department shall establish a program to award grants of settlement funds from the appropriation under [Wis. Stat. §] 20.855(4)(h) for alternative fuels." The governor also vetoed in full a nonstatutory provision regarding the allocations of these funds. 2019 Wis. Act 9, § 9101(2i).[13]

¶271 The legislature's budget bill did not propose an appropriation in whole or in part for alternative fuels generally. Instead, the legislature proposed an appropriation for the replacement of school buses.[14] While both proposals may have similar green energy goals, the governor's partial vetoes created an entirely new policy proposal that spends money in ways not proposed in the legislature's bill. This gubernatorial-created policy sidestepped the constitutionally mandated procedures governing how a bill becomes a law.

¶272 Second, the governor used a trio of vetoes to rewrite an appropriation for local road funding into an appropriation for some other undefined local grant. The governor began with a partial veto of Act 9, § 126 (schedule item Wis. Stat.

---

[13] The legislature's proposal stated: "Of the settlement funds in [Wis. Stat. §] 20.855(4)(h), during the 2019-21 fiscal biennium, the department of administration shall allocate $3,000,000 for grants under [Wis. Stat. §] 16.047(4s) for the replacement of school buses."

[14] The governor's budget had proposed utilizing these funds to allow for "the installation of charging stations for vehicles with an electric motor," which the legislature rejected in favor of creating a school bus modernization fund. See Chief Justice Roggensack's concurrence/dissent, ¶14 & n.6-7. In effect, the governor's vetoes could allow for something the legislature considered but rejected in enacting its own policy proposal.

22

§ 20.395(2)(fc)) as follows: "(fc) Local ~~roads improvement discretionary~~ supplement . . . ~~90,000,000~~[inserting 75,000,000]." Next, the governor partially vetoed Act 9, § 184s as follows: "20.395(2)(fc) of the statutes is created to read: 20.395(2)(fc) Local ~~roads improvement discretionary~~ supplement. From the general fund, as a continuing appropriation, the amounts in the schedule for the local ~~roads improvement discretionary supplemental~~ grant ~~program under s. 86.31 (3s)~~." Wisconsin Stat. § 20.395(2)(fc) now reads: "Local supplement. From the general fund, as a continuing appropriation, the amounts in the schedule for local grant." Finally, the governor vetoed in full Act 9, § 1095m, which detailed how the Department of Transportation was to structure and allocate the discretionary grants for local road improvements.[15]

---

[15] Prior to the governor's veto of this provision in full, it provided:

86.31(3s) of the statutes is created to read:

86.31(3s) DISCRETIONARY SUPPLEMENTAL GRANTS. (a) Funds provided under [Wis. Stat. §] 20.395(2)(fc) shall be distributed under this subsection as discretionary grants to reimburse political subdivisions for improvements. The department [of transportation] shall solicit and provide discretionary grants under this subsection until all funds appropriated under [§] 20.395(2)(fc) have been expended.

(b)1. From the appropriation under [§] 20.395(2)(fc), the department shall allocate $32,003,200 in fiscal year 2019-20, to fund county trunk highway improvements.

2. From the appropriation under [§] 20.395(2)(fc), the department shall allocate $35,149,400 in fiscal year 2019-20, to fund town road improvements.

¶273 The legislature did not propose a broad and vague appropriation for local grants in whole or in part. Rather, the legislature detailed a grant program for the express purpose of improving local roads. By clever editing, the governor created a new appropriation out of thin air. But again, appropriations must originate in the legislature, which has the power to enact such laws in the first instance. Wis. Const. art. IV, § 17(2), § 19; id. art. VIII, § 2. While the governor may generally accept or reject appropriations proposed to him, he cannot through creative editing author a new appropriation never proposed to him.

¶274 Finally, the governor created a new vaping-related tax not proposed by the legislature. The vetoed provision reads:

> 139.75 (14) of the statutes is created to read:

> 139.75 (14) "Vapor product" means a noncombustible product that produces vapor or aerosol for inhalation from the application of a heating element ~~to a liquid or other substance that is depleted as the product is used~~, regardless of whether the liquid or other substance contains nicotine.

2019 Wis. Act 9, § 1754. As enacted by the legislature, this section taxed the hardware that produces vapor as a result of applying the heating element to the liquid. Through his vetoes

---

3. From the appropriation under [§] 20.395(2)(fc), the department shall allocate $22,847,400 in fiscal year 2019-20, to fund municipal street improvement projects.

(c) Notwithstanding sub. (4), a political subdivision may apply to the department under this subsection for reimbursement of not more than 90 percent of eligible costs of an improvement.

2019 Wis. Act 9, § 1095m.

24

the governor created a new tax on the liquid which goes inside the device, often sold separately.

¶275 Once more, a tax on the liquid inside a vaping device was not proposed to the governor. His veto went beyond negating a proposal; he created a new tax on a product. Because the legislature did not propose this new tax, the governor did not have the power to rewrite language to create it. This kind of editing exceeds the governor's partial veto power.

## III. CONCLUSION

¶276 Faithfulness to the whole constitution and the structure it establishes means our partial veto jurisprudence needs a partial reset. We cannot myopically focus our attention on the words of the partial veto provisions in our constitution at the expense of the rest of the document's text. Early cases established principles outlining a broad and expansive partial veto power that is no doubt legislative in nature. I accept those cases and the basic framework they outlined. But more recent cases, in combination with gubernatorial creativity, have upset the constitutional order and allowed governors to invade the lawmaking powers of the legislature. It is time to reestablish these core constitutional principles. I conclude that three sets of vetoes

25

challenged here go beyond what the constitution permits.[16] For these reasons, I respectfully concur.

¶277 I am authorized to state that Justice ANNETTE KINGSLAND ZIEGLER joins this concurrence.

---

[16] A compelling case can be made that prospective application of the new rule announced in this case is warranted here. See State v. Beaver Dam Area Dev. Corp., 2008 WI 90, ¶¶95-96, 312 Wis. 2d 84, 752 N.W.2d 295 (explaining when prospective application is warranted). However, under the circumstances, I join the court's mandate that grants the relief requested for all vetoes we determine are unconstitutional.

2